TRIANGLE IMPROVEMENT COUNCIL ET AL. *v.* RITCHIE, COMMISSIONER, STATE ROAD COMMISSION OF WEST VIRGINIA, ET AL.

No. 712.   Argued March 22, 1971—Decided May 17, 1971

*Jack Greenberg* argued the cause for petitioners.   With him on the briefs were *James M. Nabrit III, Charles Stephen Ralston, Elizabeth B. DuBois,* and *Thomas J. O'Sullivan.*

*William Bradford Reynolds* argued the cause for the federal respondents *pro hac vice.*   With him on the brief were *Solicitor General Griswold* and *Assistant Attorney General Gray.   Stanley E. Preiser* argued the cause and filed a brief for the state respondents.

*Kenneth F. Phillips* filed a brief for the National Housing and Economic Development Law Project as *amicus curiae* urging reversal.

PER CURIAM.

The writ of certiorari is dismissed as improvidently granted.

MR. JUSTICE HARLAN, concurring.

In light of my Brother DOUGLAS' assertion, *post,* at 508, that today's disposition might be taken to impair the integrity of the "rule of four," see *Ferguson* v. *Moore-McCormack Lines,* 352 U. S. 521, 559–562, 564 (1957) (opinion of this writer), I deem it appropriate to set forth my reasons for joining in the dismissal of the writ as improvidently granted.

498

The Federal-Aid Highway Act of 1968 provided in pertinent part that:

> "The Secretary [of Transportation] shall not approve any project [such as that here involved] which will cause the displacement of any person . . . unless he receives satisfactory assurances from the State Highway department that—
>
> .        .        .        .        .
>
> "(3) within a reasonable period of time prior to displacement there will be available, to the extent that can reasonably be accomplished, in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, decent, safe, and sanitary dwellings, as defined by the Secretary, equal in number to the number of and available to such displaced families and individuals and reasonably accessible to their places of employment." 23 U. S. C. § 502 (1964 ed., Supp. V).

The principal issue presented by this case is whether that statute, either of its own force or together with the administrative regulations promulgated pursuant to it, prevents the Secretary from authorizing construction of a segment of the interstate highway system, even where the rights-of-way had been acquired and some persons displaced prior to the effective date of the 1968 Act, unless the State first compiles a comprehensive formal relocation plan. In short, the question is what constitutes "satisfactory assurances" in such a case.

Since certiorari was granted, a number of events have occurred that, in my judgment, have rendered this case wholly inappropriate for our review. First, the Act upon which petitioners base their case has been repealed. Secondly, a new statute has been enacted by the Congress

that alters drastically the potential impact of any decision we might reach in this case. Third, we were informed that, as of the date of oral argument, less than 10 persons remained to be displaced by this federal project. Finally, in their brief on the merits in this Court, petitioners have almost completely abandoned their original claim for relief and now seek to broaden substantially the nature of the remedy they seek.

The original prayer for relief simply sought to enjoin further displacement pending submission and implementation of a formal relocation plan by the West Virginia State Highway Department. The fact that the statute has been repealed since certiorari was granted and that less than 10 persons would be affected were we to accept petitioners' legal position renders this case, I think, a classic instance of a situation where the exercise of our powers of review would be of no significant continuing national import. Of course, every individual alleging he has been abused by the exercise of federal power should, as a general matter, be heard, even where his situation becomes unique due to repeal or cessation of the action he challenges. That is why federal district courts and courts of appeals are provided and vested with largely obligatory jurisdiction. Hearing such claims is not, however, a principal purpose for which this Court sits. See Rule 19 of the Rules of this Court.

At the same time Congress repealed the 1968 Act it enacted the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970. 84 Stat. 1894. Its principal purpose, as the title implies, was to establish a uniform governing rule of federal law for all federally directed and federally financed projects that cause displacement of persons and businesses. The 1970 Act was very consciously modeled on the 1968 Federal-Aid Highway Act, following "as closely as possible [its] substantive provisions," S. Rep. No. 91–488 (1969), in an

effort to assure that all persons uprooted by federal authority would receive the beneficent protection earlier extended to those situated in the path of highway construction. See especially 115 Cong. Rec. 31535 (remarks of Sen. Cooper). Section 210 of the new Act provides that:

> "[T]he head of a Federal agency shall not approve any grant to . . . a State agency, under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after the effective date of this title, unless he receives satisfactory assurances from such State agency that—
>
> .      .      .      .      .
>
> "(2) relocation assistance programs offering the services described in section 205 shall be provided to such displaced persons;
> "(3) within a reasonable period of time prior to displacement, decent, safe, and sanitary replacement dwellings will be available to displaced persons in accordance with section 205 (c)(3)."

Section 205 (c)(3) describes in some detail the services that must be provided. It does not, however, explicitly state that such "program" shall include a comprehensive plan reflecting the projected relocation of each individual affected.

Arguably, the presence of this provision would enhance the general significance of our construction of the relevant,[1] and similarly worded, section of the 1968 Act.

---

[1] The 1968 Act is still the relevant focus of this class action. The 1970 Act did not become effective until January 1971, and it specifically preserves rights and liabilities existing under prior Acts. § 220 (b). Those petitioners not relocated prior to the effective date of the 1970 Act may have a claim under the latter statute as well.

Indeed, my Brother DOUGLAS asserts that "any necessary interpretation of the 1968 [Act] would be equally applicable to the 1970 Act." *Post,* at 504, n. 1. For me, however, this does not increase, but rather further diminishes, the appropriateness of our ruling in the instant case.

This case comes to us on a record that sheds light only upon the proper construction of the 1968 Act which governed only federal programs, administered by one agency, that aid highway construction by the States. It now appears that anything we might hold in that regard may very well have to be carried over in full force to govern the administration of the large number of federal programs that bring about human displacement. To render our determination upon such a wide-ranging issue we should, at a minimum, have the benefit of the thinking of lower federal courts on this problem, as well as some knowledge of the responses of the various affected agencies to this new statute. Yet we are entirely without these essential aids.

To the extent, then, that the instant case has any significance for the future, it seems to me that such issues should await a case arising under the new statute. Insofar as the case can be said to present an issue only as to the proper construction of the 1968 Act, events subsequent to the granting of the writ have, as noted previously, robbed it of all national significance.

Finally, it is troublesome that petitioners have virtually abandoned their initial claim for relief. Instead of the preparation of a plan,[2] they now seek a decree to the effect that the District Court should bring before it all

---

[2] Petitioners have not wholly abandoned their original claim for relief. They argue that preparation of a plan "may be appropriate relief" for those not yet relocated. Petitioners' Brief 51. Prime emphasis, however, is placed upon the new remedial technique described in the text.

persons displaced by the highway and inquire whether their new locations meet statutory standards. As to this issue, there is neither an opinion below nor a record upon which to judge the claim. The case was tried upon a theory that the statutes require a formal plan, not that numerous individuals had been improperly relocated in fact. And there would seem to be no bar to the initiation of subsequent proceedings, in the District Court, raising individual claims of this sort where they do exist.

In light of this changed posture of the case, I do not think its adjudication would be a provident expenditure of the energies of the Court. Cf. *Sanks* v. *Georgia,* 401 U. S. 144 (1971).

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL concur, dissenting.

This case involves two federal-aid interstate highway projects in Charleston, West Virginia. Charleston lies in a narrow valley, along the Kanawha River and is bisected on the east by the Elk River which joins the Kanawha near the center of the city. The Triangle district is located along the south side of the Elk and near its mouth. Many of the residents of the Triangle district are elderly and almost all have comparatively low incomes. As often happens with interstate highways, the route selected was through the poor area of town, not through the area where the politically powerful people live.

The common urban housing shortage is severe in Charleston, in part, because many homes have been demolished for public projects. The impact of public projects in the Triangle has been exceptionally severe. Land clearance for a proposed expansion of a local water company displaced some 243 persons a few years ago. The planned interstate highway will displace about 300 more.

And a proposed urban renewal project (which has been postponed indefinitely because of lack of replacement housing) will displace almost all of the area's 2,000 residents.

Although alternative routes for the interstate highway were considered, the route through Triangle was selected and approved in 1964. Federal authorization for the right-of-way was given in 1966 and 1967. There were about 300 persons to be dislocated within Triangle.

On August 23, 1968, the 1968 amendments to the Federal-Aid Highway Act relating to relocation benefits for persons displaced by federal-aid highways became effective. By that date some 60% of the proposed right-of-way in the present case had been acquired by the State. But the vast majority of persons within the Triangle area, who were to be dislocated by the highway, had not yet been displaced from the area as of the effective date of the 1968 amendments.

Just over three months after the 1968 amendments became effective petitioners commenced this action, arguing that the amendments had not been complied with and that there was no state plan disclosing the existence of adequate replacement housing. Prior to trial only 17 households had been moved and over 280 persons remained to be displaced. Once the construction began, however, displacement did occur and the Solicitor General's brief, filed just before oral argument, informs us that only nine persons are left in the Triangle and virtually all the vacant housing has been demolished pursuant to an order of Under Secretary of Transportation Beggs given November 6, 1970.

Much is made of the fact that although originally about 300 people were to be displaced in the Triangle, there remain only nine who have not been taken care of or who have not on their own found new shelter. If only one person were involved, the case would, in my

view, be no different. For under our regime even one person can call a halt where government acts lawlessly. And this is patently a case where the federal bureaucracy has defied a congressional mandate.

It is notorious that interstate highways have left displaced citizens without homes because no efforts or inadequate efforts have been made for relocation. In 1962 Congress amended the Federal-Aid Highway Act to require assurances of "relocation advisory assistance" and authorized minimal payments for relocation assistance. 23 U. S. C. § 133 (repealed by Pub. L. 90–495, § 37, 82 Stat. 836). But, as Judge Sobeloff noted below, the "cold administrative indifference to the plight of those left without roofs over their heads mounted to the level of a national scandal." 429 F. 2d 423, 424 (dissenting opinion). In 1968 Congress passed certain amendments to the Act to rectify this "national scandal." [1]

The 1968 amendments provide that any person displaced by a federal-aid highway project "may elect to receive actual reasonable expenses in moving." 23 U. S. C. § 505 (1964 ed., Supp. V).[2] If a property owner, he is entitled to a payment from the State, in addition to the acquisition price of the property taken, of up to $5,000, representing the difference between the acquisition price and the cost of obtaining a comparable dwelling. A tenant may receive up to $1,500 to enable him to rent for a period of two years, or make the down payment on the purchase of a decent, safe, and sanitary

---

[1] It is true, of course, that the 1968 amendments were repealed by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 84 Stat. 1894. That Act, however, is so similar to the 1968 amendments that any necessary interpretation of the 1968 amendments would be equally applicable to the 1970 Act. For convenience I have provided parallel citations in the footnotes.

[2] Cf. § 202 of the 1970 Act.

dwelling "not . . . less desirable" than his existing one. 23 U. S. C. § 506 (1964 ed., Supp. V).[3]

The duty of the Secretary of Transportation under the amendments was made explicit. He is to see that the amendments are effective. Under 23 U. S. C. § 502 (1964 ed., Supp. V)[4] he is not to approve any project "which will cause the displacement of any person, business, or farm operation unless he receives satisfactory assurances from the State Highway department that" (1) fair and reasonable relocation and other payments will be afforded in accordance with the Act, (2) relocation assistance programs will be afforded in accordance with the Act, and (3) "within a reasonable period of time prior to displacement there will be available, to the extent that can reasonably be accomplished, in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced,

---

[3] Cf. §§ 203 and 204 of the 1970 Act. The payments are substantially higher under the new Act.

[4] Cf. § 210 of the 1970 Act: "Notwithstanding any other law, the head of a Federal agency shall not approve any grant to, or contract or agreement with, a State agency, under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after the effective date of this title, unless he receives satisfactory assurances from such State agency that—

"(1) fair and reasonable relocation payments and assistance shall be provided to or for displaced persons, as are required to be provided by a Federal agency under sections 202, 203, and 204 of this title;

"(2) relocation assistance programs offering the services described in section 205 shall be provided to such displaced persons;

"(3) within a reasonable period of time prior to displacement, decent, safe, and sanitary replacement dwellings will be available to displaced persons in accordance with section 205 (c) (3)."

Section 205 (c) (3) of the 1970 Act is virtually identical to § 502 (3) mentioned *infra* in the textual paragraph.

decent, safe, and sanitary dwellings . . . equal in number to the number of and available to such displaced families and individuals and reasonably accessible to their places of employment."

Satisfactory assurances have been strictly defined by regulation. Instructional Memorandum 80–1–68, § 5a (5) of the Department of Transportation requires that the program be "realistic." "The State highway department, prior to proceeding with . . . construction shall furnish . . . information for review and approval by the division engineer [concerning methods] *by which the needs of every individual to be displaced will be evaluated and correlated with available decent, safe, and sanitary housing [and the methods] by which the State will . . . inventory . . . currently available comparable housing.*" (Italics added.) *Id.*, at § 7b. Instructional Memorandum 80–1–68 was issued on September 5, 1968, § 5b of which stated that "assurances are not required where authorization to acquire right-of-way or to commence construction has been given prior to the issuance of this memorandum." [5] Even with this restriction, the memorandum would apply to this case since construction was not authorized until the fall of 1969.

The route for the highway was approved in 1964 and approval for acquisition of right-of-way was given in both 1966 and 1967. In early 1968 the Director of Public Roads issued a memorandum to his regional and state administrators directing that relocation problems be con-

[5] The Secretary, however, has subsequently changed that position and the memorandum now applies to all approvals of construction. See Memorandum of Secretary of Transportation: Implementation of Replacement Housing Policy, January 15, 1970; Federal Highway Administration Circular Memorandum: Relocation Assistance—Availability of Replacement Housing, March 27, 1970.

sidered more extensively. A state plan for Charleston was reviewed and a federal division engineer stated:

> "In the Charleston area the State did secure valuable information relative to persons to be dislocated by a survey which was a valuable assist in defining the overall problem involved. It would not be considered, in our opinion, a complete relocation plan since it did not provide information either factual, estimated or projected as to the availability of replacement housing."

Since there was no need for a relocation plan at all, the division engineer felt that the "half of a plan" of the State was to their credit. Then on August 23, 1968, the 1968 amendments became effective. Section 511 (3) (1964 ed., Supp. V) [6] provided that a displaced person was "any person who moves from real property on or after the effective date of this chapter" as a result of acquisition for a federal-aid highway.

The Secretary did not require the State to comply with the requirements of § 502. Yet as of the effective date of the 1968 amendments there had been no authorization of construction and at least 280 persons remained in the project area to be dislocated. The State finally did prepare a relocation plan, but only in response to this lawsuit and while the federal officials have obtained a copy of it, we are told they have made no attempt to review it. The plan that was prepared does not consider competing and simultaneous needs of other displaced persons because competition was not considered relevant. No formal plan for relocation was submitted to the division engineer because of the administrative interpretation that if authorization to acquire right-of-way had been

---

[6] § 101 (6) of the 1970 Act.

given prior to August 23, 1968, then the 1968 amendments were of no effect. Subsequent to the District Court order dismissing petitioners' complaint construction was authorized.

This petition should not be dismissed as improvidently granted. Our "rule of four" [7] allows any four Justices to vote to grant certiorari and set the case for consideration on the merits. The four who now dissent were the only ones to vote to grant the petition. The rule should not be changed to a "rule of five" by actions of the five Justices who originally opposed certiorari. It is improper for them to dismiss the case after oral argument unless one of the four who voted to grant moves so to do, which has not occurred here. As MR. JUSTICE HARLAN has noted it would save time and money if the five would dismiss as improvidently granted immediately after certiorari is granted rather than waiting for briefs and oral argument. *Ferguson* v. *Moore-McCormack Lines,* 352 U. S. 521, 560 (separate opinion). As JUSTICE HARLAN's opinion in *Ferguson* makes clear, it is the duty of the five opposing certiorari to persuade others at Conference, but, failing that, to vote on the merits of the case. *Id.,* at 562. His advice should be heeded here, lest the integrity of the "rule of four" be impaired.

I therefore dissent from a dismissal of this petition.

---

[7] The problem is an old and recurring one. Mr. Justice Frankfurter took the position that even the five who voted to deny the petition can, after oral argument, properly dismiss the writ as improvidently granted. *United States* v. *Shannon,* 342 U. S. 288, 294–297. But I thought then—and still think—that such a practice impairs "the integrity of our certiorari jurisdiction." *Id.,* at 298.

"By long practice—announced to the Congress and well-known to this Bar—it takes four votes out of a Court of nine to grant a petition for certiorari. If four can grant and the opposing five dismiss, then the four cannot get a decision of the case on the merits. The integrity of the four-vote rule on certiorari would then be impaired." *Ibid.*