**David E. COLLINS and Judith T. Collins, Plaintiffs–Appellants**

v.

**The UNITED STATES, Defendant– Appellee.**

No. 90–5130.

United States Court of Appeals, Federal Circuit.

Oct. 7, 1991.

Robert F. Cossolini, Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, N.J., argued, for plaintiffs-appellants.

Lisa B. Donis, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief were Mark Barash and Anthony R. Conte, Office of the Regional Solicitor, Dept. of the Interior, Newton, Mass., of counsel.

Before MICHEL, LOURIE and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

David E. and Judith T. Collins appeal the judgment of the U.S. Claims Court that § 303(1) of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("Acquisition Act"), Pub.L. No. 91–646, 84 Stat. 1894, *codified at* 42 U.S.C. § 4653(1) (1988), does not require reimbursement of their state tax payment. *Collins v. United States*, No. 703–88C (May 16, 1990). We affirm because, in requiring reimbursement of a "transfer tax" or "similar expenses incidental to conveying such real property to the United States," § 4653(1) does not include the tax paid by the Collins on the gain from the sale of their property.

I

The Collins, residents of New Jersey, purchased undeveloped land in Vermont in 1983. In 1986, the Collins were notified that the Government intended to acquire the Vermont land for the Appalachian Trail pursuant to the National Trails Systems Act of 1968, Pub.L. No. 90–543, 82 Stat. 919, *codified at* 16 U.S.C. § 1246 (1988). A voluntary sale of the land was consummated in 1987 for the agreed fair market value of the property. The state of Vermont levied a tax of $10,778.68 upon the Collins pursuant to VT.STAT.ANN. tit. 32, § 10001 (1987) ("Land Gains tax"), which imposes "a tax on the gains from the sale or exchange of land in Vermont." After payment of the amount due, the Collins claimed reimbursement for the assessment from the Department of the Interior. Their claim was denied because the assessment was not covered by § 303 of the Acquisition Act, which states:

The head of a Federal agency, as soon as practicable after the date of payment of the purchase price or the date of deposit in court of funds to satisfy the award of compensation in a condemnation proceeding to acquire real property, whichever is the earlier, shall reimburse the owner, to the extent the head of such agency deems fair and reasonable, for expenses he necessarily incurred for—

(1) recording fees, transfer taxes, and similar expenses incidental to conveying such real property to the United States;

(2) penalty costs for prepayment of any preexisting recorded mortgage entered in good faith encumbering such real property; and

(3) the pro rata portion of real property taxes paid which are allocable to a period subsequent to the date of vesting title in the United States, or the effective date of possession of such real property by the United States, whichever is earlier.

42 U.S.C. § 4653 (1988).

The Collins then filed suit in the Claims Court. On cross motions for summary judgment, the Claims Court concluded that assessments under the Land Gains tax

were neither a transfer tax nor a similar expense for which reimbursement would be required. The court stated that "the [Land Gains] tax is on the gain and not on the act of transfer." First, the court noted that Vermont had a separately-codified transfer tax. Second, the court noted that, since failure to pay the Land Gains tax would not preclude recording the transfer of title, the tax did not fall within the traditional meaning of a transfer tax. Therefore, the court concluded that, for purposes of the Acquisition Act, the Vermont Land Gains tax was not a covered expense because the tax "is not centered on the act of transfer," and because it was not "with[in] events that make up and comprise the events that are involved in the transfer of title."

## II

The Collins assert that the Land Gains tax was assessed "as a direct and sole consequence of," and is "inextricably intertwined" with, the transfer of their property to the United States, and thus falls squarely within the scope of § 303(1), either because the payment was a transfer tax or constituted a similar expense. The tax, the Collins note, was triggered by the transfer of title of land for consideration. With regard to the Claims Court's recognition of Vermont's separate Property Transfer tax, the Collins point out that Vermont also has a separately-codified capital gains tax. The state's capital gains tax was paid by the Collins and is not at issue here. Besides, the Collins note, whether the Land Gains tax might be considered a capital gains tax in some respects did not address whether it could not also be a transfer tax. Furthermore, the Collins note that, had they not dealt voluntarily with the Government, then the delay in acquisition would have significantly diminished the assessment under the Land Gains tax because the tax rate falls as the time the property is held increases. Thus, the Collins contend, through their cooperation and the Government's refusal to reimburse them, they have been left to shoulder some of the burden of establishing the Appalachian Scenic Trail. The Collins suggest that we read the relevant portions of the Acquisi-

tion Act as a requirement that the Government make people whole when their property is acquired for the public good. In sum, the Collins contend that the relevant test under the federal statute is whether the tax would not be imposed but for the decision of the Government to acquire the property.

The Government responds that the federal statute only requires reimbursement for locality fees that cover the cost of recordation of the deed. The Government argues that the statute "reimburses only for costs associated with the actual conveyance of the property" and not "for *all* the expenses associated with selling to the Government." Finally, the Government contends that the Collins should have included the Land Gains tax assessment in the negotiated price.

## III

In this appeal, we must interpret the scope of the statutory language that requires the Government to reimburse the owner for transfer taxes and similar expenses incidental to conveying real property to the United States. After arriving at a proper construction of this statute, we must then decide whether the Land Gains tax assessed by Vermont in this circumstance is a covered expense. This, also, is a matter of law because "a court of appeals should review *de novo* a ... court's determination of state law." *Salve Regina College v. Russell*, —— U.S. ——, ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

■ One preliminary issue is clear upon a reading of the Acquisition Act and the conceded facts of the case. We must reject the Government's suggestion, not adopted by the Claims Court, that the final actual price should be considered as including the Land Gains tax because the sale was a result of voluntary negotiations. First, § 301 of the Acquisition Act provides that the Government "shall make every reasonable effort to acquire expeditiously real property by negotiation," § 301(1), and that the first "offer to acquire the property" shall, in no event, "be less than the agen-

cy's approved appraisal of the fair market value of such property." § 301(3). For an eventual negotiated price to have included the Land Gains tax, therefore, the actual price paid for the property must logically exceed the Government's approved appraisal of the fair market value. In moving for summary judgment, the Government necessarily agreed that the eventual price paid represented the fair market value of the property. That undisputed foundation removes, *ipso facto*, its argument that the negotiated price included the Land Gains tax assessment. Interestingly, the Government objected to the obligation to reveal its appraisal in its opening bid during hearings on the proposed bill in both the House [1] and the Senate.[2] Senator Muskie, the sponsor of the legislation, responded: "I would rather see the Federal Government occasionally pay more than a fair market value than to see it too often pay less than the fair market value." [3]

Second, the statute expressly provides for no distinction between reimbursable additional costs whether those costs are incurred after a negotiated sale or after a condemnation proceeding thereby precluding the Government from arguing that the Collins were obliged at their risk to negotiate any transfer tax into the final price. Furthermore, § 303 states that the seller may seek reimbursement of specified additional costs "after the date of payment of the purchase price." Since the statute expressly creates a right to additional payments after consummation of title transfer, the Government is similarly precluded from claiming that such later-incurred costs must be considered as integrated into any eventual sale agreement unless the private party were to have expressly waived that statutory right, which is not the case here. Other sections of the Acquisition Act also provide for the payment of later-incurred expenses, such as litigation expenses, 42 U.S.C. § 4654 (1988), moving expenses for relocated persons or businesses, § 4622, and other relocation benefits premised on actual costs incurred. 42 U.S.C. §§ 4623, 4624 (1988). Presumably, Congress realized that the enumerated expenses consequential to land acquisition could not be calculated at the time of the title transfer transaction.

## IV

In reviewing the legislative history of the Acquisition Act *sua sponte*, we find no indication of the intended scope of 42 U.S.C. § 4653(1).[4] However, the legislative history does compel us to reject the contention of the Collins that Congress intended to leave property owners economically whole after a Governmental property ac-

---

1. *Uniform Relocation Assistance and Land Acquisition Policies Act of 1969: Hearings on H.R. 14898, H.R. 14899 and S. 1 Before the House Comm. on Public Works*, 91st Cong., 1st and 2d Sess. (1969–70) at 526–527, 557, 573, 1014 (hereinafter, "House Hearings").

2. *Uniform Relocation Assistance and Land Acquisition Policies Act of 1969: Hearings on S. 1 Before the Subcomm. on Intergovernmental Relations of the Senate Comm. on Government Operations*, 91st Cong., 1st Sess. (1969) at 175, 226–227, 236–239 (hereinafter, "Senate Hearings").

3. Senate Hearings at 178; *see also* Senate Hearings at 20 (1969) ("This provision is intended to assure that ... [the Government's] offer to the owner shall not be less than appraised value."); *Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970*, H.Rep. No. 91–1656, 91st Cong., 2d Sess. 23 (1970) ("Any policy which does not entitle the property owner to an offer of the full amount of the agency's approved value estimate, where the owner must sell, is unfair.")

4. Nor do we find assistance in the legislative history or text of the Federal–Aid Highway Act of 1968, Pub.L. No. 90–495, 82 Stat. 815 (1968), *repealed by* the Acquisition Act, upon which the latter Act was "very consciously modeled." *Triangle Improvement Council v. Ritchie*, 402 U.S. 497, 499, 91 S.Ct. 1650, 1650–51, 29 L.Ed.2d 61 (1971) (Harlan, J., concurring in summary dismissal of writ of certiorari); *see also, id.*, at 504 n. 1, 91 S.Ct. at 1653 n. 1 (Douglas, J., dissenting from summary dismissal). The Federal–Aid Highway Act of 1968, at § 507, provided in pertinent part that:

   (a) In addition to amounts otherwise authorized by this title, the State shall reimburse the owner of real property acquired for a project for reasonable and necessary expenses incurred for (1) recording fees, transfer taxes, and similar expenses incidental to conveying such property.

   82 Stat. at 832–33.

quisition. As initially proposed, S. 1 provided that "[t]he head of a Federal agency shall conduct transactions for the acquisition of real property in such a manner as to assure to the extent possible that persons whose property is acquired shall not be worse off economically than they were before the property was acquired." Acquisition Act, S. 1, § 301(a)(1), 115 *Cong.Rec.* 31375 (Oct. 23, 1969), as passed by the Senate, 115 *Cong.Rec.* 31535 (Oct. 27, 1969). The Government had objected to this provision during hearings before the Senate.[5] The House of Representatives deleted it. 116 *Cong.Rec.* 40166 (Dec. 7, 1970).

Moreover, Congress considered and rejected other provisions that would have provided for a fuller measure of compensation for the effects of a Government property acquisition. Congress rejected a proposal that payments not be treated as capital gains under the Internal Revenue Code. 116 *Cong.Rec.* 40169 (Dec. 7, 1970). Although considered, Congress failed to provide for reimbursement for possible increases in the interest cost of a new mortgage.[6]

Finally, the fact that the enacted statute categorically enumerates various reimbursable expenses, rather than providing for consequential losses or an accounting for damages, creates a presumption that Congress intended to limit reimbursement to the listed categories. Thus, we must reject the contention of the Collins that the Congressional purpose in enacting the Acquisition Act was to insure that relocated persons would suffer no possible economic loss from a Government land acquisition.

## V

*Chevron U.S.A. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1983), supplies the general principles to be applied in cases such as this:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (notes omitted).

█ Neither the plain language of the statute nor the legislative history expressly address whether Congress intended the scope of the statutory terms at issue here—"transfer taxes, and similar expenses"—to include assessments like those under Vermont's Land Gains tax. We look then to the various regulations promulgated by the various federal agencies in implementing the particular statutory section. However, these regulations, including those of the Department of Interior at issue here, largely reiterate the statutory language without explication or illustration of their intended scope.[7] In contrast, the Federal Highway Administration ("FHA") issued detailed instructions implementing the parent Act, the Federal–Aid Highway Act of 1968, during Congressional consideration of the Acquisition Act. Instructional Memorandum 80–2–70, Federal Highway Administration (Oct. 30, 1970), *reprinted in* 35 *Fed.Reg.* 19232 (Dec. 19, 1970) (codi-

---

5. Senate Hearings at 219, 236.

6. Senate Hearings at 203, 261, 299; House Hearings at 131, 228, 236.

7. 41 C.F.R. § 114–50.316 (1987) (Department of the Interior); *see also* 23 C.F.R. § 712.504(g)

(1987) (Federal Highway Administration); 25 C.F.R. § 700.123 (1987) (Bureau of Indian Affairs); 39 C.F.R. §§ 777.24(h), 777.33(a) (1987) (U.S. Postal Service); 49 C.F.R. §§ 25.106, 25.-402(e) (1987) (Office of the Secretary of Transportation).

fied at 23 C.F.R. App. A (1971)). In the memorandum, at ¶ 37, FHA illustrated the intended scope of § 507 of the Federal–Aid Highway Act, the parallel provision directing reimbursement of transfer taxes and similar expenses, by giving examples of potentially included or excluded expenses. Expenses required for completion of a title transferring transaction, such as costs to execute a release of a mortgage, when required, were considered necessarily incidental to the transfer and therefore reimbursable. On the other hand, FHA stated that the statute excluded such expenses as attorney's fees, unless the fee were to "fall into the category of escrow agent, [when] it may be eligible. Where it is necessary to go into court *in order to complete the transaction,* as where a minor or incompetent is involved, reasonable costs for such services would be eligible." 35 *Fed.Reg.* at 19243 (codified at 23 C.F.R. App. A (1971) Instructional Memorandum 80–2–70 at ¶ 37) (emphasis added). The FHA memorandum contains no suggestion that personal tax liabilities arising from, and after completion of, a land transfer would qualify for reimbursement. The FHA interpretation of identical statutory language is entitled to consideration, both under *Chevron* and, more specifically, because Congress was presumably aware of FHA's interpretation of the statutory language when it incorporated the same language in the Acquisition Act to make federal practice uniform. We also find persuasive this interpretation of the scope of the section at issue in light of the traditional nature of a locality's property transfer taxes which are generally due at settlement or before the property transfer transaction can be given legal effect. We conclude, therefore, that the enumerated category contained in § 303(1) of the Acquisition Act describes, and is limited to, a set of expenses that are customarily and necessarily paid "in order to complete the [legal] transaction" of property title transfer or to perfect the recording of the new deed.

## VI

The Land Gains tax at issue here is statutorily defined as a "personal debt of the person liable," VT.STAT. ANN. tit. 32, § 10007(d), and the "person liable for the tax is the transferor (which includes the owner, seller, or other exchanger) of the land sold or exchanged." *Id.* at § 10006. The tax is due "[w]ithin 30 days of the sale or exchange of land." *Id.* at § 10007(b).[8] The title transfer is recorded regardless of payment, although the state may later obtain a lien upon the property in the event the tax is not paid. *Id.* at § 10007(e). This set of facts distinguishes Vermont's Property Transfer tax which is due at "the time of delivery to [the town] clerk for recording of a deed evidencing a transfer of title to property subject to the tax." *Id.* at § 9605. Furthermore, the town clerk is proscribed from recording the deed in the event the Property Transfer tax has not been paid. *Id.* at § 9608.

Therefore, we must conclude that the Land Gains tax is neither a transfer tax nor a similar expense because the tax bears no relationship to the acts of completing legal title transfer or recording of the new deed. Vermont does not prohibit the recording of the transfer in the event that the tax is not paid, as is customary for taxes assessed before completion of the act of title transfer. Moreover, Vermont expressly makes the tax a continuing personal liability of the seller even after the transfer of the title has been effected. These two considerations, drawn from the statutory language, place the Vermont Land Gains tax outside the contemplated federal statutory category which includes only those expenses that are required to

---

**8.** Vermont has provided various statutory mechanisms to insure that the transferor may not avoid this personal liability. Thus, although the tax is not due at the time of land transfer, the purchaser must "withhold ten per cent of all consideration" and remit that amount to the state, *id.* at § 10007(a), whereupon "the seller or transferor shall file a return with the commissioner of taxes setting forth the amount of the tax due pursuant to § 10003 of this title and the amount withheld by the buyer or transferee." *Id.* at § 10007(b). Alternatively, the seller may avoid a withholding and discharge the personal liability by certification of advance payment or an advance ruling that no payment will be due. *Id.* at § 10007(c).

"complete the [legal] transaction" of title transfer. For the same reasons, the tax cannot be a similar expense, such as other property settlement costs, which must also be paid prior to completion of the legal property transfer transaction. Here, the Government could have obtained a freely-alienable title regardless of whether the tax had been duly paid by the Collins.

We therefore affirm the judgment of the Claims Court that the Collins are not entitled to reimbursement of the amount paid to Vermont in satisfaction of the Land Gains tax.

AFFIRMED.