174 F.3d 180
 The JERSEY HEIGHTS NEIGHBORHOOD ASSOCIATION, a non-profit
membership association; Charles K. Whittington; Ann V.
Church; Daniel Appleby, The Reverend; James Boone; Billy
Chandler; Rita Chandler; Elsie M. Trader; Dwight Waters;
Madeline Waters; Starr Sherrie Waters, by her next friends
Dwight and Madeline Waters; Shirley Winder, Plaintiffs-Appellants,
v.
Parris N. GLENDENING, in his official capacity as Governor
of the State of Maryland; State Of Maryland; Parker F.
Williams, in his official capacity as Administrator of the
Maryland State Highway Administration; Maryland State
Highway Administration (MSHA); David L. Winstead, in his
official capacity as Secretary of the Maryland Department of
Transportation; Maryland Department of Transportation
(MDOT); Federal Highway Administration; Rodney E. Slater,
in his official capacity as Secretary of the United States
Department of Transportation; United States Department of
Transportation, Defendants-Appellees,
and
Philip L. Tilghman, in his official capacity as President of
the Wicomico County Council; Theodore Shea, in his official
capacity as Acting Director of the Wicomico County Planning
and Zoning Office; Wicomico County, Maryland, Defendants.
 No. 98-1804.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 26, 1999.
Decided April 5, 1999.
 
 ARGUED: Steven Paul Hollman, Hogan & Hartson, L.L.P., Washington, D.C., for Appellants. Lawrence Paul Fletcher-Hill, Assistant Attorney General, Baltimore, Maryland, for state Appellees; Eileen Therese McDonough, United States Department of Justice, Washington, D.C., for federal Appellees. ON BRIEF: Deborah A. Jeon, American Civil Liberties Union Foundation of Maryland, Centreville, Maryland; Sherrilyn Ifill, The Public Justice Center, Inc., Baltimore, Maryland, for Appellants. J. Joseph Curran, Jr., Attorney General of Maryland, Linda D. Strozyk, Assistant Attorney General, Margaret Witherup Tindall, Staff Attorney, Baltimore, Maryland, for state Appellees; Lois J. Schiffer, Assistant Attorney General, Environment and Natural Resources Division, Andrea Berlowe, Robert L. Klarquist, United States Department of Justice, Washington, D.C.; Allen F. Loucks, Assistant United States Attorney, Baltimore, Maryland, for federal Appellees.
 Before WILKINSON, Chief Judge, and WILKINS and KING, Circuit Judges.
 OPINION
 WILKINSON, Chief Judge:
 
 
 1
 Residents of the community of Jersey Heights, Maryland challenge the siting of a new highway adjacent to their neighborhood. They assert claims against state and federal agencies and officials under the Federal-Aid Highway Act, the National Environmental Policy Act, Title VI of the Civil Rights Act of 1964, the Fair Housing Act, and the Maryland Environmental Policy Act, as well as the Equal Protection Clause and 42 U.S.C. §§ 1983 and 1985. On the defendants' motions to dismiss, the district court found that the residents had failed to state a claim under the Fair Housing Act and that the rest of their claims were time-barred. The court then dismissed their complaint. Jersey Heights Neighborhood Ass'n v. Glendening, 2 F.Supp.2d 772 (D.Md.1998).
 
 
 2
 Appellants seek to derail this highway construction project years after the original siting decision was made. Most of their claims are now stale, and we affirm their dismissal. There is one exception: We reinstate as timely appellants' challenge to the agencies' decision not to prepare a supplemental environmental impact statement in 1995. We also hold that appellants' Title VI and section 1985 claims against the federal defendants are barred by sovereign immunity, and that appellants failed to state a claim under the Fair Housing Act. We therefore affirm in part, reverse in part, and remand this case for proceedings consistent with this opinion.
 
 I.
 
 3
 Maryland intends, with federal funding assistance, to build a new Route 50 Bypass around the City of Salisbury in the eastern part of the State. Route 50 is the principal latitudinal artery spanning Maryland's eastern peninsula. Constructed nearly a half-century ago, the highway serves the region's commercial traffic and funnels seasonal vacationers from Baltimore and Washington to the seaside resort of Ocean City. At present, the route also passes directly through downtown Salisbury, where it doubles as a main thoroughfare for local traffic.
 
 
 4
 Officials began as early as 1975 to look for ways to alleviate the resulting traffic and congestion in downtown Salisbury. Their remedy of choice was to construct a bypass around the City. As with any public project of this magnitude, a long process of agency planning and public debate ensued.
 
 
 5
 In order to receive federal funding for the Bypass the Maryland State Highway Administration (SHA) was required to follow the approval process established under the Federal-Aid Highway Act (FAHA), 23 U.S.C. § 101 et seq. Although the details of this process have evolved since 1975, its essential mandates have remained constant. State planners must first choose a site for the highway, an endeavor requiring the consideration of alternative locations, community participation in public hearings, and preparation of environmental impact statements in compliance with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. See 23 U.S.C. §§ 109,128; 23 C.F.R. Part 771. The Federal Highway Administration (FHWA) has final approval authority over the final environmental impact statement (FEIS), and memorializes that approval by issuing a Record of Decision (ROD). 23 C.F.R. §§ 771.125, .127. Certification of compliance with FAHA's public participation requirements and issuance of the ROD are "considered acceptance of the general project location." Id. § 771.113. In projects like this one, subsequent phases of the project such as final engineering design, property acquisition, and actual construction "shall not proceed" until after location approval. Id. § 771.113; see also id. § 771.127.
 
 
 6
 The SHA began studying alternate locations for the Route 50 Bypass in 1976. Officials considered a number of different routes, held public meetings, and prepared a draft environmental impact statement (DEIS). In 1981, however, the project was shelved for lack of funding.
 
 
 7
 In 1985 funding was restored, and the SHA again explored alternate highway routes. After a public meeting the SHA issued a new DEIS examining various alternatives and promoting one, dubbed Alternate 4, as the preferred corridor for the Bypass. Alternate 4 traverses two census tracts to the north of Salisbury in Wicomico County, one of which has a greater than ninety percent African American population and the other of which apparently is predominately white. When the SHA issued the FEIS in May 1989, Alternate 4 remained the agency's preferred route. On August 17, 1989, the FHWA issued a ROD granting location approval for Alternate 4.
 
 
 8
 Since 1989 the Bypass project has progressed slowly. Planners have pressed ahead, pursuing additional permits and preparing final engineering designs. And in 1997 Maryland's Governor Parris Glendening announced that funding had been allocated for construction.
 
 
 9
 Meanwhile, opposition to the Bypass mushroomed in Jersey Heights, a predominately African American community lying just to the south of the highway's approved location. In a series of meetings with SHA officials, community members alleged that they had been excluded from the highway planning process and voiced their objection to the siting of the Bypass. In 1994 residents filed an administrative complaint with the FHWA. After an investigation, the FHWA found that no discrimination had occurred in the siting process. That ruling has been appealed with the agency.
 
 
 10
 In September 1997 the Jersey Heights Neighborhood Association and a number of individual Jersey Heights residents (collectively the Neighborhood Association) filed this suit in the United States District Court for the District of Maryland. Their complaint named several federal, state, and local agencies and officials and asserted claims under FAHA, NEPA, Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d et seq., the Fair Housing Act, 42 U.S.C. § 3601 et seq., and the Maryland Environmental Policy Act, Md.Code Ann., Natural Resources § 1-301 et seq., as well as the Equal Protection Clause and 42 U.S.C. §§ 1983 and 1985.
 
 
 11
 Specifically, the Neighborhood Association alleged that African American residents did not receive individual notice that the Bypass was in the works or that public meetings were being held, even though similarly-situated white residents did. They further claimed that the DEIS and FEIS were based on inaccurate data, ignored socioeconomic impacts, and failed adequately to compare siting alternatives or mitigating measures. Finally, they contended that the Bypass would have a disparate adverse impact on their African American community.
 
 
 12
 On the defendants' motions the district court dismissed the case in its entirety, holding that the Neighborhood Association had failed to state a valid claim under the Fair Housing Act and that the remainder of its claims were barred by statutes of limitations and by laches. Jersey Heights Neighborhood Ass'n, 2 F.Supp.2d 772. The Association appeals with regard to the federal and state defendants, and we affirm in part and reverse in part.
 
 II.
 
 13
 In an attempt to escape the limitations problems in this case, the Neighborhood Association's complaint tells the hundred-year history of the City of Salisbury and the neighborhood of Jersey Heights, beginning at the turn of the century and ending just before the appropriation of highway construction funds. An Article III court, however, must focus on concrete disputes between particular parties. And the concrete dispute before us concerns only the siting and planning of the Route 50 Bypass.
 
 
 14
 In considering the Neighborhood Association's complaint, the district court separated its claims into those challenging conduct leading up to the original highway siting decision in 1989 and those challenging conduct that followed the issuance of the ROD. Because we hold that claims arising out of the original site selection ripened and began to accrue at the latest with the issuance of the ROD on August 17, 1989, we agree with this approach. We therefore proceed first to examine appellants' pre-ROD claims.
 
 
 15
 In short, the eight-year interval between the ROD and the filing of this complaint exceeds the statute of limitations for each of appellants' pre-ROD claims, rendering time-barred the Neighborhood Association's challenge to the original siting decision. We address seriatim the length and accrual of the limitations periods for these claims.
 
 A.
 
 16
 The Neighborhood Association alleges that the site selection process violated the procedural requirements of FAHA and NEPA. The Association asserts that Jersey Heights residents were denied notice of and excluded from project hearings in violation of FAHA's public participation mandate, 23 U.S.C. § 128. It further alleges that federal and state planners failed adequately to weigh the Bypass' economic, social, and environmental effects as required by FAHA, id. § 109(h), and NEPA, 42 U.S.C. § 4332. Since neither FAHA nor NEPA itself provides a private right of action, all of these claims lie under the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq. Sierra Club v. Slater, 120 F.3d 623, 630-31 (6th Cir.1997); see also Arlington Coalition on Transp. v. Volpe, 458 F.2d 1323, 1332 (4th Cir.1972).[1]
 
 
 17
 The APA does not include its own statute of limitations. In fact, appellants contend that the application of a limitations period to its NEPA and FAHA claims would run counter to the protective purposes of those statutes, and urge this court instead to analyze its claims under the equitable doctrine of laches. According to the general statute of limitations for claims against the government, however, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Because an action against a federal agency is an action against the United States, "a complaint under the APA for review of an agency action is a 'civil action' within the meaning of section 2401(a)." Sierra Club, 120 F.3d at 631; accord Sierra Club v. Penfold, 857 F.2d 1307, 1315 (9th Cir.1988); Impro Prods., Inc. v. Block, 722 F.2d 845, 849-50 & n. 8 (D.C.Cir.1983). The plain language of this statute thus encompasses actions such as this one, and the Neighborhood Association's NEPA and FAHA claims are subject to its six-year limitation.
 
 
 18
 Conduct becomes reviewable under the APA upon "final agency action," 5 U.S.C. § 704, in other words, when " 'the agency has completed its decisionmaking process, and [when] the result of that process is one that will directly affect the parties.' " Franklin v. Massachusetts, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). Here, by approving the selection of Alternate 4 as the Bypass corridor the FHWA certified that the SHA had satisfied its responsibilities under NEPA and FAHA. See 23 C.F.R. § 771.113. On the fundamental question of where the highway would be located, the ROD thus signaled the end of the decisionmaking process. At that point the agencies had resolved to locate the highway adjacent to Jersey Heights, the project was cleared to move forward into its final design and property acquisition phases, and the community members had allegedly suffered discrimination in the exercise of their participatory rights. Whether the residents characterize their injury as the discrimination alone or as the resulting siting decision, that injury had been sustained by the time the ROD issued in 1989.
 
 
 19
 Consequently, we agree with the district court that the August 17, 1989 ROD was the final agency action for the Bypass siting decision. This designation of the ROD as final agency action under the APA is generally recognized. See Sierra Club, 120 F.3d at 631 ("[I]t appears well-established that a final EIS or the ROD issued thereon constitute the 'final agency action' for purposes of the APA."); Oregon Natural Resources Council v. Harrell, 52 F.3d 1499, 1503-04(9th Cir.1995) (same). The Neighborhood Association's APA claims therefore accrued on that date and lapsed six years later, in 1995. Since the Association did not instigate this suit until 1997, those claims are time-barred.
 
 B.
 
 20
 Appellants raise claims against the state defendants under three additional statutes: sections 1983 and 1985 and Title VI.[2] They complain that appellees excluded the residents of Jersey Heights from the Bypass selection process in violation of the Equal Protection Clause and Title VI and that the adverse impacts from that site selection will be unfairly distributed. Like their claims under NEPA and FAHA, however, these allegations are time-barred.
 
 
 21
 All three of these statutes borrow their limitations periods from state law. It is well-settled that sections 1983 and 1985 borrow the state's general personal injury limitations period, which in Maryland is three years. Md.Code Ann., Courts and Judicial Proceedings § 5-101; Wilson v. Garcia, 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); Nasim v. Warden, Md. House of Correction, 64 F.3d 951, 955 (4th Cir.1995) (en banc). The question of which period to apply to claims under Title VI, which bars "discrimination under any program or activity receiving Federal financial assistance," 42 U.S.C. § 2000d, is still open in this circuit.
 
 
 22
 No party has suggested that Maryland has a specific, comparable statute to Title VI, and this court does not know of one. See McCullough v. Branch Banking & Trust Co., 35 F.3d 127, 129-30 (4th Cir.1994). We therefore agree with our sister circuits that have considered the question that the personal nature of the right against discrimination justifies applying the state personal injury limitations period to Title VI claims. See, e.g., Rozar v. Mullis, 85 F.3d 556, 561 (11th Cir.1996) (collecting cases). As a result, Maryland's three-year limitations period applies to all three of these claims.
 
 
 23
 "Under federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Nasim, 64 F.3d at 955. Although the Neighborhood Association again attempts to depict the Bypass project as a seamless and as-yet-unfinished whole, public officials made the final site selection nearly a decade ago and marked that choice by issuing the ROD. To the extent, then, that the Neighborhood Association alleges that the selection of Alternate 4 caused its members injury, they knew or should have known of that injury at the latest when the selection process ended in 1989.
 
 
 24
 In fact, the complaint and the record demonstrate that some Jersey Heights residents had actual knowledge of the corridor selection process before the ROD ever issued. The Neighborhood Association admits that a "handful" of residents received notice of the selection process by 1988--before the release of either the FEIS or the ROD. Compl. at 47 p 178. Moreover, notice of the DEIS and FEIS was published in the Federal Register in 1988 and 1989. See 54 Fed.Reg. 25618 (1989) (FEIS); 53 Fed.Reg. 1063 (1988) (DEIS). The record thus supports the district court's conclusion that appellants knew or should have known of their alleged injuries by August 17, 1989. By waiting until 1997 to file its complaint, the Neighborhood Association defaulted its claims.
 
 C.
 
 25
 The Neighborhood Association presents three arguments for avoiding the effects of the statutes of limitations, none of which is availing. First, the Association contends that the "final agency action" occurred not in 1989 but much later, when the FHWA approved detailed designs and actually committed federal funds to the project. We disagree. "In determining the finality of agency action a court should consider the practical effect of the [agency's] determination." Chamblee v. Espy, 100 F.3d 15, 17 (4th Cir.1996) (internal quotation marks omitted). As appellants themselves note, public works such as this one are long, complex endeavors requiring significant effort and investment on the part of a myriad of federal and state agencies. Nevertheless, these projects have clear milestones, the clearest of which is the issuance of the ROD. Once the FHWA gives the green light to a specific highway corridor, expectations harden and large public investments are made in detailed designs, property acquisition, and even construction, all in reliance on the validity of that decision. See 23 C.F.R. § 771.113 (prohibiting "final design activities, property acquisition ..., purchase of construction materials or rolling stock, or project construction" before the ROD is issued). If parties think a site selection process has been defective, it is far preferable for everyone that they make their challenges promptly. Not only would public agencies avoid wasting time and funds, aggrieved citizens would be able to voice their objections before the sheer momentum of a project dooms the favorable consideration of their grievances. Here, by waiting until fully eight years had passed before challenging the ROD, the Neighborhood Association simply delayed too long.
 
 
 26
 Second, even if the ROD constituted final agency action, the Neighborhood Association argues that a court would not have considered its claims in 1989 because they were not ripe at that time. See Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 162-63, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). According to the Association, in 1989 construction of the Bypass remained contingent upon the SHA's successfully clearing a number of additional practical and regulatory hurdles. Under this theory, prudential considerations would have prevented a court from considering appellants' challenge until funds were actually appropriated for the project.
 
 
 27
 We decline to adopt such an open-ended view of these claims. As we have noted, the ROD marked the FHWA's conclusion that the siting process satisfied FAHA and NEPA--a purely legal question that was "final and not dependent upon future uncertainties or intervening agency rulings." Charter Fed. Savings Bank v. Office of Thrift Supervision, 976 F.2d 203, 208 (4th Cir.1992); accord Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Moreover, there was no obvious factual contingency that put construction seriously in doubt. See National Wildlife Fed'n v. Goldschmidt, 677 F.2d 259, 263-64 (2d Cir.1982) (finding case unripe when construction of one highway segment was "tied ... to the problematic fate" of a separate, unapproved segment). Rather, in 1989 the project was poised to move forward into its subsequent stages. Furthermore, the balance of hardships in 1989 would have favored prompt, rather than delayed, review of the residents' claims. See Abbott Labs., 387 U.S. at 149, 152-57, 87 S.Ct. 1507. The Jersey Heights community obviously had an interest in having its claims heard at that time. And it was to the advantage of the state and federal agencies to clear any cloud over the ROD before expectations were formed and monies sunk in reliance on its validity. We must keep in mind that the Bypass was proposed to further an important public purpose. The Neighborhood Association itself recognizes that traffic conditions in downtown Salisbury have been intolerable for decades. According to the DEIS, the rate of motor vehicle accidents in the City involving personal injury or property damage between 1983 and 1986 significantly exceeded Maryland statewide averages. Since it would have been to everyone's benefit in 1989 to remove the legal shadows from the corridor selection process, ripeness would have posed no bar to this suit at that time.
 
 
 28
 Finally, the Neighborhood Association argues that the statutes of limitations do not bar its claims because the Bypass project as a whole constitutes a continuing violation that has endured into the present. But our circuit precedent forecloses this contention. Under established law, a "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." National Adver. Co. v. City of Raleigh, 947 F.2d 1158, 1166 (4th Cir.1991) (internal quotation marks omitted). At bottom, appellants' continuing violation argument rests on the alleged ongoing effects of the original decision to locate the highway in proximity to Jersey Heights. Appellants cite no discrete acts of discrimination that fall within the limitations period. Although the Neighborhood Association contends that the SHA and the FHWA failed to consider and mitigate the Bypass' impacts on the community even after the issuance of the ROD, every refusal to reconsider the Bypass location does not revive the limitations period for the original siting decision. To do so would upset the balance struck by the limitations period between the reasonable needs of individual claimants and the public interest in finality. "A continuing wrong theory should not provide a means of relieving [a] plaintiff from its duty of reasonable diligence in pursuing its claims." Id. at 1168 (internal quotation marks omitted). Having ignored its right to raise its complaints in the years following the issuance of the ROD, the Neighborhood Association cannot now use its stale claims to derail a decade of public effort.
 
 III.
 
 29
 After the issuance of the ROD, state and federal agencies continued to work to bring the Bypass to fruition. The Neighborhood Association raises two main issues with regard to the agencies' post-ROD conduct. First, the Association challenges the events leading up to an SHA decision in late 1991 or early 1992 to shift a segment of the highway closer to Jersey Heights. Second, it contests the SHA's and FHWA's judgment in 1995 that the FEIS did not require updating with a supplemental environmental impact statement (SEIS). We address these claims in turn.[3]
 
 A.
 
 30
 The Neighborhood Association first contests the SHA's decision to shift a segment of the Bypass southward to avoid a newly constructed radio tower and office building and an area of wetlands. The Association charges the SHA with intentionally excluding community members from this second decisionmaking process in violation of Title VI and the Equal Protection Clause. Nevertheless, appellants themselves admit that the "decision to shift the proposed location of the Bypass was taken by SHA in late 1991 or early 1992." Compl. at 53 p 198. Accepting these allegations as true, all of the conduct of which the Neighborhood Association complains--and thus the latest date on which it alleges discrimination--occurred by 1992, over five years before it filed this suit. These actions do not fall within the three-year limitations periods for Title VI and sections 1983 and 1985. The district court therefore properly dismissed the Neighborhood Association's post-ROD Title VI and section 1983 and 1985 claims against the state defendants.
 
 
 31
 Appellants note that in 1992 the Jersey Heights residents voiced their objections to the highway's location directly with the SHA and FHWA rather than bringing them to court, and maintain that the application of the limitations period penalizes them for pursuing an administrative rather than a litigious course. It is indeed desirable for citizens to bring their objections in the first instance to those who are best placed to resolve them. But the fact that the residents are not entirely satisfied with the result of their administrative strategy--inasmuch as they have been unable to block the Bypass altogether--does not permit us now to discard the statutory limitations period in their favor.
 
 B.
 
 32
 The Neighborhood Association next challenges the decision of the SHA--and, we assume, the ratification of that decision by the FHWA--not to prepare an SEIS in 1995. In dismissing appellants' FAHA and NEPA claims in their entirety on statute of limitations grounds, the district court did not address this 1995 decision. This was error.
 
 
 33
 Even after the issuance of an FEIS, an agency must prepare an SEIS when a project changes or when new information comes to light such that the project "will affect the quality of the human environment in a significant manner or to a significant extent not already considered." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotation marks omitted); accord Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 443 (4th Cir.1996). To effect this continuing duty of examination, FHWA regulations require that an FEIS be reevaluated "if major steps to advance the action ... have not occurred within three years after the approval of the final EIS." 23 C.F.R. § 771.129. If a new circumstance "present[s] a seriously different picture of the environmental impact of the proposed project from what was previously envisioned," the FEIS must be supplemented. Hickory Neighborhood Defense League v. Skinner, 893 F.2d 58, 63 (4th Cir.1990) (internal quotation marks omitted); see 23 C.F.R. § 771.130.
 
 
 34
 On June 13, 1995, the SHA submitted to the FHWA its reevaluation of the 1989 FEIS. This study concluded that "the current design plans ... in comparison with the FEIS selected alternate ... will not result in any additional significant socio-economic or natural environmental impacts," and therefore that "the FEIS remains valid and ... no supplemental environmental documentation is required." The FHWA concurred in this evaluation on August 8, 1995.
 
 
 35
 In its complaint, the Neighborhood Association challenged the decision not to prepare an SEIS. Compl. at 68 p 252. It further alleged that the SHA and FHWA's reevaluation gave insufficient weight to the project's effects on Jersey Heights residents and inadequately considered the necessity of mitigating measures in violation of NEPA and FAHA. Id. at 51 pp 192, 193. In contrast to its challenges to the siting decision itself, and unlike its complaints under sections 1983 and 1985 and Title VI, here the Neighborhood Association alleged potential violations of NEPA and FAHA that fall squarely within the six-year limitations period for those statutes.
 
 
 36
 Although we express no judgment on the merits of these claims, it is plain that the statute of limitations does not bar their consideration. We therefore reinstate appellants' NEPA and FAHA claims to the extent they challenge the decision not to prepare an SEIS in 1995. We also reinstate their pendent claims under Maryland's analogous environmental statute, the Maryland Environmental Policy Act.IV.
 
 
 37
 We address separately the Neighborhood Association's claims against the federal defendants under section 1985 and Title VI, which the district court also dismissed as untimely. We affirm the court's judgment, but on different grounds: Because these statutes do not provide a cause of action against the United States, these claims are barred by sovereign immunity.
 
 
 38
 The response to the section 1985 action is straightforward: Since the statute by its terms applies only to "persons," the "United States is not subject to suit under section 1985(3)." Mousseaux v. United States, 28 F.3d 786, 787 (8th Cir.1994). With regard to appellants' action for injunctive relief against DOT Secretary Rodney Slater, their conclusory complaint fails to allege the elements of a civil rights conspiracy with the requisite particularity. Hughes v. Ranger Fuel Corp., 467 F.2d 6, 9-10 & n. 11 (4th Cir.1972). These section 1985 claims were properly dismissed.
 
 
 39
 With regard to Title VI, the Neighborhood Association asserts that the federal defendants have abdicated their duty under section 602 of that title to eliminate discrimination in federally-funded programs by terminating those funds. See 42 U.S.C. § 2000d-1. The statute, however, includes no express cause of action, and we decline to imply one against the federal government. Although the Supreme Court in Cannon v. University of Chicago, 441 U.S. 677, 703, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), approved an implied right of action against the recipients of federal funds under section 601 of Title VI, it is a different question altogether whether private parties may sue the federal funding agencies themselves under section 602. We hold that they may not.
 
 
 40
 Our interpretive task is a narrow one, "limited solely to determining whether Congress intended to create the private right of action" appellants assert. Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). The text of the statute does not suggest an affirmative answer to that inquiry, and the structure of the statutory scheme points to the negative. Title VI creates a two-pronged attack on discrimination by federal funding recipients: direct action against those recipients by private parties, see Cannon, 441 U.S. at 703, 99 S.Ct. 1946, and action by funding agencies to secure voluntary compliance or to terminate funds altogether, see 42 U.S.C. § 2000d-1. Aggrieved individuals can mobilize the latter remedies by petitioning the agency. 49 C.F.R. § 21.11(b). We do not think Congress intended those same individuals to circumvent that very administrative scheme through direct litigation against federal agencies. See NAACP v. Medical Ctr., Inc., 599 F.2d 1247, 1254-55 & n. 27 (3d Cir.1979).
 
 
 41
 Furthermore, in canvassing the legislative history of the Act, the Supreme Court itself has referred to such direct suits as "disruptive" and has suggested that Congress intended to foreclose them. Cannon, 441 U.S. at 706-07 n. 41, 99 S.Ct. 1946; id. at 715, 99 S.Ct. 1946 (observing that Title VI "appears to have been a compromise aimed at protecting individual rights without subjecting the Government to suits"); see also Women's Equity Action League (WEAL) v. Cavazos, 906 F.2d 742, 748-50 (D.C.Cir.1990). In light of this evidence, we conclude that Congress did not intend to include in Title VI the additional right of action--and thereby to effectuate the waiver of sovereign immunity--that the Neighborhood Association requests of us.
 
 
 42
 Nor does the Neighborhood Association have a cause of action under the APA. According to that statute, only "[a]gency action made reviewable by statute and final agency action for which there is no adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Again, this claim is not "made reviewable" under Title VI. Moreover, we think that Cannon 's direct remedy against funding recipients is not only "adequate," but, as the Supreme Court recognized, is preferable to a direct suit against the agency itself. Cannon, 441 U.S. at 706-07 n. 41, 99 S.Ct. 1946; see Washington Legal Found. v. Alexander, 984 F.2d 483, 486-88 (D.C.Cir.1993); WEAL, 906 F.2d at 750-51; Medical Ctr., 599 F.2d at 1254 n. 27. The Neighborhood Association thus lacks an APA action to enforce Title VI's supervisory duties against the federal agencies.
 
 V.
 
 43
 We finally consider the Neighborhood Association's allegations under the Fair Housing Act, or Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq. This Act makes it unlawful
 
 
 44
 To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin[,]
 
 42 U.S.C. § 3604(a), and
 
 45
 To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin[,]
 
 
 46
 id. § 3604(b).
 
 
 47
 The Neighborhood Association does not allege that anyone has for discriminatory reasons been evicted from his home or denied the right to purchase or rent housing. Instead, the Association claims that appellees violated these statutory provisions simply by selecting the current corridor for the Route 50 Bypass. Because this challenge to the highway site selection process is too remotely related to the housing interests that are protected by the Fair Housing Act, we affirm the district court's dismissal of this count of the complaint for failure to state a claim under the statute.
 
 
 48
 With regard to section 3604(a), the agencies did not "make unavailable or deny a dwelling to any person" within the meaning of the Fair Housing Act. Although the Neighborhood Association claims that this provision reaches every practice having the effect of making housing more difficult to obtain, the text of the statute does not extend so far. This court has previously noted that section 3604(a) does not reach every event "that might conceivably affect the availability of housing." Mackey v. Nationwide Ins. Cos., 724 F.2d 419, 423 (4th Cir.1984). Rather, "[s]ection 3604(a) is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons." Southend Neighborhood Improvement Ass'n v. County of St. Clair, 743 F.2d 1207, 1210 (7th Cir.1984). To that end courts have considered claims under this provision in cases of, for example, racial steering by real estate agents, see Village of Bellwood v. Dwivedi, 895 F.2d 1521 (7th Cir.1990), and discriminatory rental policies, see Betsey v. Turtle Creek Assocs., 736 F.2d 983 (4th Cir.1984). These policies, however, are "housing-related" in a way that a highway siting decision is not. Countless private and official decisions may affect housing in some remote and indirect manner, but the Fair Housing Act requires a closer causal link between housing and the disputed action. See Edwards v. Johnston County Health Dep't, 885 F.2d 1215, 1222 (4th Cir.1989). To draw every outlying official decision into the orbit of section 3604(a) would be to warp that statute into a charter of plenary review.
 
 
 49
 Moreover, the Neighborhood Association fails properly to allege that the Bypass siting decision will make housing "unavailable" on racial grounds. The Association claims that, once built, the Bypass will serve as the northern boundary to their community, closing off expansion in that direction and locking African Americans into what is allegedly the only neighborhood open to them. Appellants' argument, however, assumes the presence of an intervening discriminatory actor preventing them from settling elsewhere in the Salisbury area. And their complaint neither names such an actor nor references any current discriminatory sale or leasing practice. If housing opportunities in the City of Salisbury are denied to its citizens on the basis of their race, those unlawful practices will be fully actionable under the Fair Housing Act. This roundabout attack on the location of the Bypass, however, fails to state a claim under the Act.
 
 
 50
 For similar reasons, the Neighborhood Association fails to state a claim under section 3604(b). The Bypass siting decision does not implicate "the terms, conditions, or privileges of sale or rental of a dwelling, or ... the provision of services or facilities in connection therewith." This provision by its terms extends only to housing and housing-related services. Although the Neighborhood Association contends that the Bypass is a housing "service," and complains that it will disproportionately suffer its burdens, "that is a strained interpretation of the word." Mackey, 724 F.2d at 424.
 
 
 51
 The Fair Housing Act's services provision simply requires that "such things as garbage collection and other services of the kind usually provided by municipalities" not be denied on a discriminatory basis. Id. It does not extend to every activity having any conceivable effect on neighborhood residents. See id. (hazard insurance is not a "service"); Clifton Terrace Assocs., Ltd. v. United Techs. Corp., 929 F.2d 714, 720 (D.C.Cir.1991) (elevator manufacturer is not a provider of "services"); Southend Neighborhood Improvement Ass'n, 743 F.2d at 1210 (maintenance of county-owned neighborhood property is not a "service"); Laramore v. Illinois Sports Facilities Auth., 722 F.Supp. 443, 452 (N.D.Ill.1989) (stadium site selection is not the provision of a "service"). "To say that every discriminatory municipal policy is prohibited by the Fair Housing Act would be to expand that Act to a civil rights statute of general applicability rather than one dealing with the specific problems of fair housing opportunities." Clifton Terrace Assocs., 929 F.2d at 720 (quoting Vercher v. Harrisburg Housing Auth., 454 F.Supp. 423, 424 (M.D.Pa.1978)). In selecting a site for the Route 50 Bypass around the City of Salisbury, defendants did not become providers of housing services within the meaning of section 3604(b).[4]
 
 
 52
 In light of the fact that no one has refused to sell or rent a dwelling to any of appellants on a discriminatory basis, the Association's challenge boils down to a complaint that the proposed roadway will pass in proximity to its community. But this claim requires a major transformation in the Fair Housing Act itself. We do not find in section 3604's prohibitory language the positive entitlement that appellants seek. The Fair Housing Act does not grant to residents the right to have highways sited where they please. The Supreme Court has cautioned against transforming into positive guarantees the language prohibiting discrimination in the Fourteenth Amendment. See, e.g., Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). We see no reason why this oft-repeated constitutional lesson should not apply to statutory construction as well.
 
 
 53
 Finally, the Association argues that the underlying purpose of the Fair Housing Act "is that similarly situated residents are entitled to the equal distribution of benefits," and therefore that "residents also must be entitled to the equal distribution of burdens." This proportional burden theory is an unmanageable proposition. Under the Association's standard, how is a multicultural society ever to locate a highway? Suppose a roadway runs by a neighborhood that is thirty-five percent Anglo, forty-five percent Latino, and twenty-percent African American. Does the predominant ethnic group have a disparate impact claim? What if thirty-five percent of a route runs proximate to a predominately Asian American neighborhood and twenty-five percent next to a predominately Hispanic American neighborhood? Will planners have to relocate the corridor to ensure that it affects each ethnicity proportionally? Simply to pose these questions is to demonstrate the absurdity of the result: a twisting, turning roadway that zigs and zags only to capture equally every ethnic subset of our population. Such a standard would lead to race-based decisionmaking of the worst sort. We do not think the drafters of the Fair Housing Act ever contemplated such a reading.
 
 VI.
 
 54
 To summarize, we affirm the district court's dismissal of all of the Neighborhood Association's challenges to defendants' pre-ROD conduct on the ground that they are time-barred. We affirm the dismissal of its section 1983, section 1985, and Title VI challenges to the state defendants' post-ROD conduct for the same reason. We affirm the dismissal of its section 1985 and Title VI complaints against the federal defendants on sovereign immunity grounds. And we agree that the Neighborhood Association failed to state a claim under the Fair Housing Act.
 
 
 55
 Finally, we reverse the judgment of the district court insofar as it dismissed the Association's NEPA and FAHA challenges to the 1995 decision not to prepare a supplemental environmental impact statement, and we reinstate appellants' pendent claim under the Maryland Environmental Policy Act. We therefore remand this case for proceedings consistent with this opinion.
 
 
 56
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 KING, Circuit Judge, concurring:
 
 57
 I concur in Chief Judge Wilkinson's well-reasoned opinion of the court. I write separately, however, to memorialize my serious concern with the shabby treatment the African-American residents of Jersey Heights have suffered at the hands of state and federal highway planners and officials.
 
 
 58
 It is no historical accident that Jersey Heights today is ninety-nine percent African-American. Displaced from their downtown neighborhoods by the construction of Route 13 in the 1930s and the original Route 50 in the 1950s, African-Americans in Salisbury relocated to Jersey Heights. As a result of widespread steering practices, Jersey Heights was the only area in which Salisbury's African-Americans could find available housing. According to one plaintiff, Salisbury has had an "unwritten law"--that "if you were a certain pigm[en]tality you had to live west of this [Wicomico River] bridge."
 
 
 59
 Now, the residents of Jersey Heights are being forced to pay the price for the mistakes made by the builders of the original Route 50--the very highway that decimated their former neighborhoods. As the court's opinion points out, the placement of Route 50 through downtown Salisbury has resulted in serious congestion and a disproportionate number of accidents, particularly during the summer beach season. The residents' sacrifice this time is for the convenience of the travelling public, particularly vacationers who utilize Route 50 for access to the ocean beaches on Maryland's Eastern Shore each summer.
 
 
 60
 First in the 1930s, again in the 1950s, and then again in the past three decades with the Bypass project, the residents of Jersey Heights understandably believe they have been treated as if they do not exist. With regard to the Bypass project, the Jersey Heights community was essentially excluded from the decisionmaking processes that led to the key alignment decisions--both the original route that was memorialized in the FEIS and the ROD, and the subsequent realignment, which shifted the route southward, significantly closer to Jersey Heights.
 
 
 61
 With two alternate routes still under study in 1985, Caucasian residents who lived in the area surrounding Alternate 2--the more northerly route farther away from Jersey Heights--received individual notice about project planning, and subsequently raised timely objections to that proposed route. The residents of Jersey Heights, however, received no individual notice, and thus were unable to timely object to Alternate 4, which, of the original four proposed alternates, was the route closest to Jersey Heights. Following the path of least resistance, the State Highway Administration (SHA) designated Alternate 4 as the preferred route, and it is Alternate 4 that was approved by the FHWA in its Record of Decision in 1989.
 
 
 62
 Although the term "environmental justice" is of fairly recent vintage, the concept is not. See Michele L. Knorr, Environmental Injustice, 6 U. Balt. J. Envtl. L. 71, 73-76 (1997).[1] As Justice Douglas pointed out nearly thirty years ago, "[a]s often happens with interstate highways, the route selected was through the poor area of town, not through the area where the politically powerful people live." Triangle Improvement Council v. Ritchie, 402 U.S. 497, 502, 91 S.Ct. 1650, 29 L.Ed.2d 61 (1971) (per curiam) (Douglas, J., dissenting).
 
 
 63
 Around 1991, SHA decided to shift the alignment farther southward, substantially closer to Jersey Heights, in order to avoid some wetlands. Again, SHA did not involve Jersey Heights in the decisionmaking process. When SHA finally met with Jersey Heights residents in November 1992, it was only after the decision regarding there alignment had already been made. The residents at the meeting were unequivocally opposed to the realignment. SHA promised to "reevaluate" the realignment in light of the questions and comments expressed by the residents. Additional meetings were held between 1992 and 1994, but to no avail. At a meeting with Jersey Heights residents in June 1993, the SHA administrator candidly acknowledged that SHA had not communicated as well as it should have with the Jersey Heights community.[2]
 
 
 64
 Having made these observations, I reiterate my wholehearted concurrence with the court's decision today to reinstate the appellants' federal and state challenges to the 1995 decision not to prepare a supplemental environmental impact statement, and to remand to the district court for further proceedings. It is my fervent hope that the governmental bureaucracies will henceforth make greater efforts to enhance community involvement in major decisionmaking processes. See Exec. Order No. 12898, 40 C.F.R. 1.70 (February 11, 1994) (Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations); Maryland Environmental Policy Act (MEPA), Md.Code Ann. Nat. Res. I, § 1-302 (1997); Advisory Council on Environmental Justice, Md. Ann.Code, art. 41, § 18-315(g)(1997 & Supp.1998).[3] The result--greater bureaucratic responsiveness--will be positive for the good citizens of Salisbury and the State of Maryland for many years to come.
 
 
 
 [1]
 The APA by its terms applies only to "agency action," and appellants have not identified the source of their cause of action against the state defendants in this case. Nevertheless, assuming that appellants have an independent action to enforce the NEPA duties to which these non-federal entities have consented, see Ely v. Velde, 497 F.2d 252 (4th Cir.1974), that action would be subject to the same time-bar as any action against the federal defendants
 
 
 [2]
 Appellants raise section 1985 and Title VI claims against the federal defendants as well. We address these claims separately. See infra section IV
 
 
 [3]
 The Neighborhood Association also makes reference to a Title VI administrative complaint that it filed in 1994 with the FHWA. The appeal of the FHWA's initial disposition of that complaint, however, is still pending with the agency. The question of whether the Association may ultimately challenge it in federal court is thus not before us
 
 
 [4]
 Since we hold that the highway siting decision does not implicate § 3604 of the Fair Housing Act, it also does not trigger any federal duties under § 3608 of that Act. The Neighborhood Association therefore fails to state a claim against the federal defendants, and the question of whether § 3608 or the APA even provides a cause of action against those defendants is one we need not decide
 
 
 [1]
 As Ms. Knorr aptly states, "[e]nvironmental health hazards are unequally distributed in the United States. Millions of people in minority and low-income communities are subjected to greater levels of pollution than Caucasian and wealthy populations because of their race or socio-economic status. Environmental injustice occurs, in part, because of the exclusion of these communities in the decisionmaking process as well as the disproportionate location of pollution." Knorr, Environmental Injustice, U. Balt. J. Envtl. L. at 71-72 (footnotes omitted)
 
 
 [2]
 At a follow-up meeting in August 1993, the SHA administrator informed the residents that it had changed its notification procedures. Now, at the beginning of a study for a project, there is a bulk mailing to every home in the zip code area covered by the project
 
 
 [3]
 Federal and state policy is consistent with the views expressed here. See, e.g., Exec. Order No. 12898, § 1-103 (the environmental justice strategy of each Federal agency shall, inter alia, "ensure greater public participation"); MEPA, tit. 1, § 1-302(e) ("It is the continuing policy of the State to cooperate with ... concerned public and private organizations and individuals, in a manner calculated to protect, preserve, and enhance the environment.")