**William C. WEBSTER, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 09–81 L.**

United States Court of Federal Claims.

Nov. 30, 2009.

William C. Webster, Tonka Bay, MN, and John C. Webster, Bayfield, WI, pro se.

Elizabeth Nicholas, Natural Resources Section, with whom were John C. Cruden, Acting Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant. William Back, Deputy Regional Solicitor, Pacific Northwest Region, United States Department of the Interior, Portland, OR, of counsel.

## OPINION

HEWITT, Chief Judge.

Before the court are plaintiffs' Complaint (Compl.), together with various attachments to plaintiffs' Complaint (plaintiffs' Appendix

or Pls.' App.);[1] Defendant's Motion to Dismiss Plaintiffs' Complaint for Lack of Jurisdiction over the Subject Matter and Memorandum in Support Thereof (defendant's Motion or Def.'s Mot.); and Plaintiffs' Response to Defendant's Opposition to ADR / Motion to Dismiss (plaintiffs' Response or Pls.' Resp.).

I.  Background

Plaintiffs, William C. Webster and John C. Webster, allege that the United States government owes them just compensation for the taking of their property for public use. Compl. 1. Plaintiffs own 126.76 acres of semi-forested mountainside located within the boundaries of North Cascades National Park in Washington state.[2]  Id. The property, known as Thunder Creek Mines (TCM), consists of six partially developed mining claims plus a five-acre mill site. Id. Thunder Creek Silver–Lead Mines was incorporated as a public mining operation in the late 1800s and was issued a patent in March 1921. Id. The TCM site was developed with twelve hundred linear feet of tunnel with rails, wiring and ventilation, four buildings, and a tramway. Id.

On October 2, 1968, North Cascades National Park was created.[3]  Id. The property at issue was then owned by Thunder Creek Silver–Lead Mines, "a voluntarily dissolved corporation with 750 shareholders in 44 states." Id. Plaintiffs inherited their family's interest, along with all of the corporate records, in January 1980. Id. Plaintiffs state that a proceeding to quiet title was held in July of 1983 in which the Websters purchased the remaining interests in TCM for $67,000 and became fee owners of the property. Compl. 1, 2 ¶ 7; see also Pls.' App. 8.2 (letter from National Park Service (NPS) Deputy Field Director William C. Walters stating that NPS files indicate that the Websters perfected their title to the TCM property at a public auction held on June 17, 1983 with a final successful bid of $67,000).

Plaintiffs have been involved in negotiations with the NPS regarding the sale of the TCM property for some thirty years. It appears that the Websters desire to sell the TCM property and the NPS wishes to purchase it, but that the parties have not been able to agree on its value. See Pls.' App. 15.3 (letter from NPS Regional Director Jonathan B. Jarvis describing the frustrated negotiation process and both parties' desire to achieve the sale of the TCM property and the protection of North Cascades National Park resources). Plaintiffs' complaint against the government arises, in large part, with respect to the valuation of the mining and recreational potential of the property. The NPS has conducted three separate appraisals-in 1978, 1989 and 2002-each resulting in a land-only valuation and offer to purchase. See Compl. 2 ¶ 4, 3 ¶¶ 13–14, 4 ¶ 20. The Websters, in turn, have commissioned mining and recreational income valuations which, they claim, support a higher sale price. See Compl. 3 ¶¶ 10–12, 4 ¶¶ 20–21.

Plaintiffs' Complaint and plaintiffs' Appendix contain a timeline of appraisals, valuations, offers, and counteroffers. Plaintiffs rely on testimony before a committee of Congress, given by one of their own predecessors in interest as an owner of the TCM property in the spring of 1968 prior to the creation of North Cascades National Park. Compl. 2 ¶ 1;

1. The facts and circumstances described in this opinion are taken from plaintiffs' Complaint (Compl.), including the attachments to plaintiffs' Complaint (plaintiffs' Appendix or Pls.' App.). The court uses the attachment numbers provided by plaintiffs to identify portions of plaintiffs' Appendix. Throughout their Complaint plaintiffs use a system of page numbers, section numbers, and paragraph numbers and letters. This opinion cites to the referenced page(s) and paragraph(s) as appropriate.

2. According to the government, the land is "very isolated, difficult to reach, steeply sloped and under snow much of the time because of the high altitude and its location in the Cascade Mountain

Range. The Webster inholding is approximately 19 miles by foot or pack animal on park trails from the nearest highway." Decl. of Rick Wagner, National Park Service (NPS) Regional Chief of Land Resources, ¶ 4 (May 8, 2009) (attached to Defendant's Motion to Dismiss Plaintiffs' Complaint for Lack of Jurisdiction over the Subject Matter and Memorandum in Support Thereof (Def.'s Mot.)).

3. Congress created North Cascades National Park on October 2, 1968 by passing Public Law Number 90–544, 82 Stat. 926 (codified as amended at 16 U.S.C. § 90 (2006)).

Pls.' App. 1. Plaintiffs claim that the testimony established an approximate value of $500,000 for the TCM property. Compl. 2 ¶ 1. The testimony was given by a Mr. William Webster, "a former secretary of a mining company [that had] done a lot of work [in the proposed park area]." Pls.' App. 1; *see* Decl. of [Plaintiff] William C. Webster ¶ 2 (July 22, 2009) (attached to Pls.' Resp.) (stating that "[p]rior to plaintiffs' inheritance, Uncle William H. Webster as Liquidating Trustee of Thunder Creek Silver–Lead Mines dealt with Congress and NPS").

The elder Mr. Webster testified in 1968 that the estimated value of the ore located on the TCM property would be $1,467,000, with two-thirds of that amount being spent in getting the ore to market. Pls.' App. 1. The first NPS appraisal, dated January 19, 1978 and completed by Mr. Leslie W. Eastman, resulted in a land-only valuation of $38,800. Compl. 2 ¶ 4; Pls.' App. 8.1. Plaintiffs assert that this appraisal was not compliant with regulations because, in determining the mineral value to be "nil," the appraisal ignored the fact that the property was "patented [mining] property with development described in the public record." Compl. 2 ¶ 4; *see also* Pls.' App. 8.1 (letter from NPS Deputy Field Director Walters stating that NPS mining engineer and mineral appraiser Charles T. Weiler's mineral valuation of the TCM property was "nil"). The NPS mailed plaintiffs a copy of the 1978 Eastman appraisal after plaintiffs inherited their family interest in January 1980. Compl. 2 ¶¶ 3–4.

In June of 1983, a TCM geologist, Professor George Weaton of the University of Minnesota, and NPS geologist Luther Clemmer inspected the property over the course of two days. Compl. 2 ¶¶ 5–6. Weaton reported a "first-look" mining potential value of $2,471,000, and Clemmer reported that $6,500 worth of further inspection was required. Compl. 2 ¶ 6. In May of 1984, after a drop in ore prices, Weaton proposed a second mining valuation: a net value of $1,450,958. *Id.* In 1983 or 1984, the Websters offered to sell the property for $500,000 in a conference call with the NPS, basing their offer on the earlier congressional testimony. Compl. 2 ¶ 7. On November 6, 1985, the Websters wrote to the NPS offering to sell for $635,000, adding "relocation costs" to their 1983/1984 offer. Compl. 3 ¶ 9; Pls.' App. 4.

In 1985, the Websters hired Professor Bob Grant of Washington, also a geologist, to conduct a second mining-potential appraisal along with NPS geologist Clemmer. Compl. 3 ¶ 10. Clemmer reported that there was no change from his 1983 report and created a supplemental report which plaintiffs state was not disclosed to them until 2003. Compl. 2 ¶ 6, 3 ¶ 10. Grant suggested the Websters look into the possibility of using the land for recreational income. Compl. 3 ¶ 11.

The Websters contacted various heli-hiking and heli-skiing organizations that might be interested in using the land for a recreational business, but the NPS objected to noise pollution and said that flights would not be allowed on weekends or holidays. *Id.* The Websters prepared a recreational income valuation for appraisal purposes, which was less costly than furnishing proof of mineral value. Compl. 3 ¶¶ 11–12. The Websters obtained "a pro forma annual operating statement for a low-density mountaineering/gemstone collecting, heli-hiking business with a net annual income of $155,000" from American Alpine Institute. Compl. 3 ¶ 12. "A cap rate value of ten times net income was stated as $1,500,000 for a purchase price consideration." *Id.*

On December 15, 1989, the NPS obtained from Macauley & Associates a second appraisal report on the TCM property and sent an offer to purchase for $56,500 to the Websters. Compl. 3 ¶¶ 13–14. Plaintiffs assert that this appraisal was not compliant with regulations because it was not given to them or to Congressman Bruce Vento, whom plaintiffs had written regarding funding for the purchase of the TCM property. *Id.*

From 1996 to 2000 plaintiffs attempted to prove the ore value as stated in the 1968 congressional testimony by submitting a plan of operations for ore shipment. Compl. 4 ¶ 18. An environmental impact statement was prepared and public hearings were held. *Id.* The plan included "road guards for helicopter flights over State Highway 20, payment of excise taxes for ore shipments into Canada, custom ore slings, etc." *Id.* Accord-

ing to plaintiffs, the plan was approved in July 2000, but because "helicopters were diverted to firefighting by the [NPS]," ore was never shipped. *Id.*

In March 2002 the NPS delivered to the Websters a new appraisal completed by the S.A. Newman firm on October 9, 2001. Compl. 4 ¶ 20. Plaintiffs assert that this appraisal was not compliant with regulations because it omitted the 1985 supplemental Clemmer report, concealing an essential fact of value, and also failed to include the pro forma recreational income value of $1,500,000. *Id.* The appraisal was delivered along with an offer to purchase form for the land-only value of $95,000. *Id.* The Websters later returned the form to "Congressional Oversight offices with a counter-offer of $2,500,000, adding 'suggested' damages consistent with regulation[s]." *Id.*

On March 10, 2003 geologist Clemmer provided the Websters with "his 1985 ore valuation of $550,000 net profit from sale of the worked ore." Compl. 4 ¶ 21; *see also* Pls.' App. 11 (Clemmer's full report). On November 10, 2004 the Websters offered to sell the property for $1,500,000. Compl. 5 ¶ 23. In October 2006 and again on February 20, 2007, the Websters offered to sell the property for $2,500,000. Compl. 5 ¶ 26. On May 4, 2007, NPS Regional Director Jarvis wrote a letter to the Websters in which he explained:

> The National Park Service policy under the Land Acquisition Policy Standards, Section 8.2.3.8, states that "[a]ppraisals greater than two years from the approval date shall be updated for just compensation purposes. Any exceptions will be approved in writing by the Chief, Appraiser, WASO (Washington, D.C.office)." The October 2001 appraisal report prepared by Mr. Newman is now approaching six (6) years old. The exception rule beyond the two year date was meant for appraisal reports that have just recently passed the two-year mark, and not reports that have

surpassed the five (5) year appraisal approval date of the report.

> We understand you feel this is a waste of time and money in conducting another appraisal report on the Thunder Creek Mines property, but government agencies are required to offer just compensation at the current fair market value of the property. This provides protection to the landowner that a fair price has been determined by the appropriate professional procedures and to the general public that the government purchase is in the best interest of the taxpayers.

> ... We must also stress that the NPS does not have the funding to contract for a new property appraisal, and that we cannot commit to any value that has not been approved by the Department's Appraisal Services Directorate.

> Your table showing your calculations to the Congressional Oversight Committees for the specific purpose of acquiring the Thunder Creek Mines property does include substantial costs and valuations that are neither appropriate for an approved fair market value appraisal nor have been validated by certified accounting documentations. In that regard, please be advised that we are not, in any manner, endorsing or agreeing to pursue a purchase price that cannot be supported by Congressionally authorized procedures.

Pls.' App. 18.

Plaintiffs filed suit in this court on February 9, 2009, alleging that their property has been taken and seeking just compensation. Compl. 1. In their complaint, plaintiffs acknowledge that determining the time of the taking is difficult and suggest several possibilities: (1) October 2, 1968 when Congress created the North Cascades National Park; (2) around 1976, when buildings on the TCM property were razed and equipment removed;[4] (3) "any of the times the owners

---

4. Plaintiffs allege that "[p]hysical taking of the property can be said to have occurred around 1976 when buildings were razed and equipment removed so the land could appear pristine to the public." Compl. 2 ¶ 2; *see also* Compl. 6. The NPS denies responsibility for the removal of the buildings and equipment. *See* Pls.' App. 6B (let-

ter from NPS Superintendent William F. Paleck denying the Websters' allegation that NPS employees burned their buildings). Plaintiffs assert that photographs on file at park headquarters in Sedro Woolley, WA, and attached to their Complaint show buildings located on the TCM property. Compl. 4 ¶ 16 & n. 5. Plaintiffs also note

were told they must comply with park regulation[s]"; and (4) September 1985, "when a PL 91–646 compliant purchase was possible because Congressional Testimony value was verified by both the NPS geologist and the owners." Compl. 6. Plaintiffs also allege that "[f]or over forty years, [the TCM] property has been used by the public as part of the North Cascades National Park. It is on every park map, the trail through it is maintained, park visitors and rangers hike it." *Id.* As a summary paragraph in the introduction to their Complaint, plaintiffs allege that "policies and actions of the National Park Service, including stalling and misleading and wrongful acts, have prevented [the Websters] from using the land which amounts to a taking of their property, requiring just compensation under the Fifth Amendment." Compl. 1.

## II. Legal Standards

### A. Tucker Act Takings Jurisdiction

■ The Tucker Act is the primary statute establishing the jurisdiction of the United States Court of Federal Claims (Court of Federal Claims). *See* 28 U.S.C. § 1491(a)(1) (2006). In relevant part, the statute provides that this court "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." *Id.* The burden of proof of establishing jurisdiction is borne by the plaintiff. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Russell v. United States,* 78 Fed.Cl. 281, 285 (2007). If the defendant challenges jurisdictional facts, the plaintiff must support them with "competent proof." *McNutt,* 298 U.S. at 189, 56 S.Ct. 780. The plaintiff bears the burden to show by a preponderance of the evidence that jurisdiction is proper. *Reynolds v. Army & Air Force*

*Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). Jurisdiction is a threshold matter and a case can proceed no further if the court lacks jurisdiction to hear it. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

■ The Tucker Act provides the waiver of sovereign immunity necessary to sue the United States for money damages, but a plaintiff must establish an independent substantive right to money damages from the United States, that is, a money-mandating source within a contract, regulation, statute, or constitutional provision itself, in order for the case to proceed. *See United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). In a takings case, the money-mandating provision is the Fifth Amendment. *Schooner Harbor Ventures, Inc. v. United States (Schooner Harbor),* 569 F.3d 1359, 1362 (Fed.Cir.2009); *Moden v. United States,* 404 F.3d 1335, 1341 (Fed.Cir. 2005).

■ The Fifth Amendment reads in relevant part, "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The United States Court of Appeals for the Federal Circuit (Federal Circuit) has developed a two-part test to determine whether a taking has in fact occurred. *Schooner Harbor,* 569 F.3d at 1362. "First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment.... If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court['s] task is at an end." *Am. Pelagic Fishing Co. v. United States (Am.Pelagic),* 379 F.3d 1363, 1372 (Fed.Cir.2004) (citations omitted). "[T]he Constitution does not itself create or define the scope of property interests protected by the Fifth Amendment. Instead, existing rules and understandings and background principles derived from an inde-

that the buildings could have been razed by United States Forest Service personnel so that Superintendent Paleck's denial could be accurate. Compl. 4 n. 5. In their Response to Defendant's Opposition to ADR/Motion to Dismiss (plaintiffs' Response or Pls.' Resp.), plaintiffs state that they inherited shares of the TCM property in 1980, and they "postulated the buildings and equip-

ment were removed around that time." Pls.' Resp. 4. The NPS "categorically denies any knowledge or responsibility for any damage to or loss of [the Websters'] private property," having investigated their complaints and found "no information concerning the existence or removal of the buildings on the property." Pls.' App. 15.2.

pendent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed.Cir.2005) (internal quotation marks omitted).

■ If the claimant identifies a cognizable property interest, the court must proceed to the second part of the analysis: "whether the governmental action at issue amounted to a compensable taking of that property interest." *Am. Pelagic*, 379 F.3d at 1372. There are two classes of takings cases, physical and regulatory. *Yee v. City of Escondido*, 503 U.S. 519, 522–23, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). An unwanted physical occupation of an individual's property constitutes a physical taking. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421, 427, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). A permanent physical occupation is a taking per se, regardless of whether it serves the public interest. *Id.* at 426, 102 S.Ct. 3164.

■ A regulatory taking, on the other hand, occurs "when a regulatory or administrative action places such burdens on the ownership of private property that essential elements of such ownership must be viewed as having been taken...." *Hendler v. United States*, 36 Fed.Cl. 574, 585 (1996), *aff'd*, 175 F.3d 1374 (Fed.Cir.1999). If a landowner has not lost all economically viable use of its property, the court will consider other factors such as the extent the regulations interfere with investment-backed expectations. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 n. 8, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."). When a taking is found, the court has essentially determined that a single private owner should not bear the entire burden of a state regulatory action in the public interest. *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). It is not a requirement that the property owner be excluded for a compensable regulatory taking to occur. *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1352 (Fed.Cir.2003) (citing *Loretto*, 458 U.S. at 436–38, 102 S.Ct. 3164). Three factors are typically considered in determining whether a regulatory action has deprived an owner of economically viable use of its property: the economic impact of the regulation, its interference with the plaintiff's investment-backed expectations, and the character of the government action. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed.Cir.2004) (discussing three relevant factors that can be used to determine the reasonableness of investment-backed expectations: "(1) whether the plaintiff operated in a 'highly regulated industry;' (2) whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property; and (3) whether the plaintiff could have 'reasonably anticipated' the possibility of such regulation in light of the 'regulatory environment' at the time of purchase.").

**B. The Court of Federal Claims "Jurisdictional" Statute of Limitations**

■ Section 2501 of title 28 of the United States Code limits the court's jurisdiction to those claims that accrue no longer than six years before the complaint is filed. 28 U.S.C. § 2501 (2006); *see Young v. United States*, 529 F.3d 1380, 1384 (Fed.Cir.2008). The six-year limitation was "attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States (Hopland)*, 855 F.2d 1573, 1576–77 (Fed.Cir.1988). The court must strictly construe the six-year limitation and it cannot be equitably tolled. *See John R. Sand & Gravel Co. v. United States (John R. Sand)*, 552 U.S. 130, 135, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008) (holding that 28 U.S.C § 2501 is "jurisdictional" in nature).

■ A claim accrues in this court "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed.Cir.2006) (quoting *Hopland*, 855 F.2d at 1577). A claim under the Fifth Amendment

accrues when the taking action occurs. *Id.* However, the claim only accrues if the claimant "knew or should have known" that the claim existed. *Id.* (quoting *Kinsey v. United States,* 852 F.2d 556, 557 n. * (Fed.Cir.1988)). Plaintiff's ignorance of a claim of which he or she should be aware is not enough to prevent claim accrual. *See Coastal Petroleum Co. v. United States,* 228 Ct.Cl. 864, 866 (1981). In order to show that his or her ignorance of the facts is excusable, plaintiff must show either that defendant has concealed its acts so that plaintiff was unaware of the existence of a cause of action or that the nature of plaintiff's injury was such that it was inherently unknowable at the time the cause of action accrued. *Id.* Where the actions of the government are open and notorious, the plaintiff is on inquiry as to his or her possible injury. *Id.* at 867.

### C. Motions to Dismiss

▆ Rule 12(b) of the Rules of the United States Court of Federal Claims (RCFC) governs motions to dismiss. Specifically, RCFC 12(b)(1) provides for motions to dismiss based on lack of subject matter jurisdiction, RCFC 12(b)(1), and RCFC 12(h)(3) states: "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action," RCFC 12(h)(3). In evaluating a claim pursuant to RCFC 12(b)(1) for lack of jurisdiction, the court must accept as true any undisputed allegations of fact made by the non-moving party and draw all reasonable inferences from those facts in the non-moving party's favor. *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995); *see also Cambridge v. United States,* 558 F.3d 1331, 1335 (Fed.Cir. 2009) (discussing RCFC 12(b)(6)); *Reynolds,* 846 F.2d at 747.

Regardless of how a plaintiff frames a complaint, this court must look at the "true nature" of the claim. *Puget Sound Energy, Inc. v. United States,* 47 Fed.Cl. 506, 510 (2000). As a general matter, complaints drafted by pro se litigants are held to "less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), but, "[t]his latitude ... does not relieve a pro se plaintiff from meeting jurisdictional requirements," *Bernard v. United States,* 59 Fed.Cl. 497, 499, *aff'd,* 98 Fed. Appx. 860 (Fed.Cir.2004) (emphasis omitted).

### III. Discussion

The issues in this case are intertwined: whether any taking occurred and, if so, when and whether plaintiffs had a legally cognizable property interest at the time of any taking. The court concludes that, even if a taking occurred and plaintiffs had a property interest at the time, their claims are barred by the statute of limitations. Accordingly, the court concludes that it lacks subject matter jurisdiction for the following reasons.

### A. Property Interest at Time of Alleged Takings

The court must first determine whether plaintiffs have established a property interest for purposes of the Fifth Amendment. *See Am. Pelagic,* 379 F.3d at 1372. Generally, because "compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment." *United States v. Dow,* 357 U.S. 17, 20–21, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958) (quoting *Danforth v. United States,* 308 U.S. 271, 284, 60 S.Ct. 231, 84 L.Ed. 240 (1939)). Under certain circumstances discussed below, a claim for compensation owed by the government may be transferred and the transferee may bring suit.

▆ The Tucker Act waives sovereign immunity for assignees as well as for those holding the original claim, except as barred by a statutory provision such as the Anti–Assignment Act. *Ins. Co. of the West v. United States,* 243 F.3d 1367, 1375 (Fed.Cir.2001). *United States v. Shannon,* 342 U.S. 288, 292, 72 S.Ct. 281, 96 L.Ed. 321 (1952). The Anti–Assignment Act, also known as the Assignment of Claims Act, prohibits the voluntary assignment of a compensation claim against the Government for the taking of property. *Dow,* 357 U.S. at 20, 78 S.Ct. 1039 (citing *Shannon,* 342 U.S. at 292, 72 S.Ct. 281).

The Federal Circuit has noted, "What is commonly called the Anti–Assignment Act consists of two statutory provisions." *Fire-*

man's Fund Ins. Co. v. England (Fireman's Fund), 313 F.3d 1344, 1349 (Fed.Cir.2002). Under 41 U.S.C. § 15(a), which is not directly at issue in this case, "[n]o contract . . . or any interest therein, shall be transferred by the party to whom such contract . . . is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned." 41 U.S.C. § 15(a) (2006). The other provision, relevant here, provides that an assignment of any part of a claim against the government or of an interest in the claim may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. *See* 31 U.S.C. § 3727(a)(1), (b) (2006). "These two provisions together broadly prohibit . . . transfers of contracts involving the United States or interests therein, and assignment of claims against the United States." *Fireman's Fund*, 313 F.3d at 1349.

On its face, this language of prohibition covers the assignments of plaintiffs' takings claims. Plaintiffs' claims had not been allowed, the amount of their claims was undecided, and no warrant for their payment had been issued. *See Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 892–93 (Fed.Cir.2008). However, the Supreme Court has recognized two types of voluntary assignments-in addition to voluntary assignments made after a claim has been allowed-as exceptions to the Anti–Assignment Act: transfers by will and general assignments for the benefit of creditors. *Shannon*, 342 U.S. at 292, 72 S.Ct. 281. The exception for transfers by will is justified by analogy to transfers by intestacy, which are exempt from the statute because they are transfers by operation of law. *Id.* It has been deemed unwise to distinguish between transfers by will and transfers by intestacy for purposes of the Anti–Assignment Act. *Id.* Similarly, the exception for voluntary assignments for the benefit of creditors is justified by analogy to assignments in bankruptcy. *Id.* (citing *Goodman v. Niblack*, 102 U.S. 556, 560–61, 26 L.Ed. 229 (1881)). The Anti–Assignment Act "applies only to cases of voluntary assignment of demands against the government. It does not embrace cases where there has been a transfer of title by operation of law. The passing of claims to heirs, devisees, or assignees in bankruptcy is not within the evil at which the statute aimed; nor does the construction given by this court deny to such parties a standing in the Court of Claims." *Erwin v. United States*, 97 U.S. 392, 397, 14 Ct.Cl. 577, 24 L.Ed. 1065 (1878).

Here, the government argues that plaintiffs did not acquire the property until 1983 and that "[b]ecause [p]laintiffs did not own the property at the time [ ] the alleged regulatory and physical takings claims accrued, they do not hav[e] standing to bring this suit and their claims should be dismissed." Def.'s Mot. 6. The court finds the factual situation somewhat more complicated than defendant contends. When North Cascades National Park was created on October 2, 1968, the TCM property was owned by Thunder Creek Silver–Lead Mines, a voluntarily dissolved corporation with 750 shareholders in 44 states. Compl. 1. Plaintiffs inherited their family's interest in January 1980. *Id.* At a proceeding to quiet title held in July of 1983, plaintiffs purchased the remaining interests in TCM for $67,000 and became fee owners of the property. Compl. 1, 2 ¶ 7.

The family interest that plaintiffs inherited in 1980 was "a 10.2% interest in the original Thunder Creek Silver–Lead Mines." Pls.' Resp. 16. The inheritance, whether by will or by intestacy, qualifies as an assignment by operation of law and falls outside of the Anti–Assignment Act's prohibition on assignment of claims against the government. *See Shannon*, 342 U.S. at 292, 72 S.Ct. 281. Plaintiffs could therefore bring claims for alleged takings of their inherited partial interest in the TCM property, subject to the statute of limitations.

However, plaintiffs' purchase of the remaining 89.8% interest in the 1983 quiet title proceeding appears to the court to be fairly characterized as a voluntary assignment, and not properly viewed as analogous to an assignment taking effect by operation of law. The acquisition of plaintiffs' 89.8% interest therefore falls within the Anti–Assignment Act's prohibition on voluntary as-

signments of claims against the government. As to their purchased interest, plaintiffs can maintain a taking claim only if the claim arose while they were the owners of the property, and then only if the taking occurred within six years before the date of their filing of their Complaint. *See Dow,* 357 U.S. at 20, 78 S.Ct. 1039. As to their inherited interest, plaintiffs can prevail on a taking claim only if the claim arose within six years before the date of their filing of their Complaint.

**B. Physical Taking Claims Time–Barred**

■■■■■ All of the actions alleged in plaintiffs' Complaint to constitute takings occurred more than six years before the filing of plaintiffs' suit and are therefore barred by this court's jurisdictional statute of limitations. *See John R. Sand,* 552 U.S. at 135, 128 S.Ct. 750. The government actions complained of occurred twenty to forty years ago. Plaintiffs allege that takings occurred: (1) on October 2, 1968 when Congress created the North Cascades National Park; (2) around 1976, when buildings on the TCM property were razed and equipment removed; (3) "any of the times the owners were told they must comply with park regulation[s]"; and (4) September 1985, "when a PL 91–646 compliant purchase was possible because Congressional Testimony value was verified by both the NPS geologist and the owners." *See* Compl. 6; *supra* Part I. The years 1968, 1976, and 1985 are all clearly outside of the six-year statute of limitations. Regarding "the times the owners were told they must comply with park regulation[s]," the government argues that such claims all stem from the creation of the park in 1968, which subjected the TCM property to regulation by the NPS. Def.'s Mot. 7. Plaintiffs also allege that "[f]or over forty years, [the TCM] property has been used by the public as part of the North Cascades National Park. It is on every park map, the trail through it is maintained, park visitors and rangers hike it." Compl. 6. There is no allegation in the Complaint as to when this trail was created or by whom. However, by stating that the public has used the TCM property "[f]or over forty years," plaintiffs' Complaint indicates that the trail was created around the same time that North Cascades National Park was established-well outside of the six-year statute of limitations.[5]

Plaintiffs do not allege that the government concealed any of its actions from them so that they could not have known about the taking of their property. The government acted openly and notoriously in creating the North Cascades National Park and implementing the park regulations. Similarly, removal of the buildings and equipment and building of a trail were open and notorious acts, readily discoverable by the property owners within the six-year statute of limitations period. Plaintiffs have not alleged facts suggesting that defendant concealed its acts or that plaintiffs' injury was inherently unknowable so as to prevent claim accrual.

■■■■ In an effort to bring their takings claim within the statute of limitations,[6] plaintiffs argue in their Response that March 10, 2003 is a significant date because geologist Luther Clemmer's 1985 report of the ore value on the TCM property became available to plaintiffs. Pls.' Resp. 5–6; *see also* Compl. 4 ¶ 21 (mentioning Clemmer's 1985 ore valuation). Plaintiffs allege that Clemmer's letter included "a copy of an appraisal NPS had concealed giving a value to the worked surface ore." Pls.' Resp. 5–6. Plain-

---

**5.** "[W]here individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed," a permanent physical taking has occurred. *Nollan v. Cal. Coastal Comm'n,* 483 U.S. 825, 832, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). However, only the original act permitting the public access is considered a compensable taking, not each successive crossing of the property by a pedestrian. *See Fallini v. United States,* 56 F.3d 1378, 1382–83 (Fed.Cir.1995); *Kemp v. United States,* 65 Fed.Cl. 818, 825 (2005). Therefore even the continued use of the trail by the

public does not bring plaintiffs' claim within the six-year statute of limitations.

**6.** Plaintiffs acknowledge in their Response that they were unaware of the six-year statute of limitations and that "[t]he date of Clemmer's letter, March 10, 2003, happens to be 1 month, 11 days shy of the statutory deadline for this claim." Pls.' Resp. 6. Plaintiffs note that a 2006 letter from NPS Regional Director Jarvis is also within this period. *Id.* at 6 n. 9; *see* Pls.' App. 15.

tiffs state that the March 10, 2003 date was significant because "[i]t was at this point plaintiffs decided the park service's real intention might be to use the land as part of the park, deny them any real, profitable use of it and yet never make a fair offer for the property." Pls.' Resp. 6. Plaintiffs' articulation of the significance of the March 10, 2003 date is itself of significance: "It was at this point plaintiffs *decided* . . . ." *See id.* (emphasis added). Takings do not arise out of the decisions of the plaintiffs, but rather out of the actions of the United States. Here there are two such actions: the creation of the park and the alleged destruction of the buildings on plaintiffs' property, both allegations of physical takings. Plaintiffs nevertheless allege the existence of a regulatory taking: the NPS has denied them all economically viable use of their property, a claim that they argue accrued upon their learning in 2003 of the 1985 Clemmer appraisal. Plaintiffs allege that "policies and actions of the National Park Service, including stalling and misleading and wrongful acts, have prevented [the Websters] from using the land which amounts to a taking of their property, requiring just compensation under the Fifth Amendment." Compl. 1.

## C. Regulatory Taking Claim

Plaintiffs allege that a regulatory taking occurred at "any of the times the owners were told they must comply with park regulation[s]" because "policies and actions of the National Park Service, including stalling and misleading and wrongful acts, have prevented them from using the land." Compl. 1, 6. In their Complaint, plaintiffs allege that the creation of the park made mining "not allowable," violating their "rights to possession, exclusion of others from the property, and use" because their "expected use of the property when bought and developed was mining." Compl. 6 & n. 8. Plaintiffs also allege that the NPS actions of "insisting [plaintiffs] comply with Park regulations and denial of

modern (motorized) access and unrestricted flights is a regulatory taking." Compl. 6. The government argues that such claims all stem from the creation of the park in 1968, which subjected the TCM property to regulation by the NPS. Def.'s Mot. 7.

As plaintiffs acknowledge, the government specifically did not take private property located within the park boundaries upon creating North Cascades National Park. Pls.' Resp. 5, 12–13. The act creating the park states: "[T]here is hereby established, *subject to valid existing rights*, the North Cascades National Park." Pub.L. No. 90–544, 82 Stat. 926 (Oct. 2, 1968) (codified as amended at 16 U.S.C. § 90 (2006)) (emphasis added). The act further provides: "Within the boundaries of the park and recreation areas, the Secretary of the Interior . . . *may* acquire lands, waters, and interests therein by donation, purchase with donated or appropriated funds, or exchange, except that he may not acquire any such interests within the recreation areas without the consent of the owner, so long as the lands are devoted to uses compatible with the purposes of this subchapter."[7] *Id.* § 90b (emphasis added). The legislation authorized "to be appropriated such sums as may be necessary to carry out the purposes of this subchapter," but specified that "not more than [$3,500,000] shall be appropriated for the acquisition of lands or interest in lands."[8] *Id.* § 90d–5. Congress did not urge rapid acquisition or vest title in the United States government immediately as it did in creating Point Reyes National Seashore and Redwood National Park. *See* 16 U.S.C. § 459c–2 ("The Secretary [of the Interior] is authorized to acquire, and it is the intent of Congress that he shall acquire as rapidly as appropriated funds become available for this purpose or as such acquisition can be accomplished by donation or with donated funds or by transfer, exchange, or otherwise the lands, waters, and other property, and improvements thereon

---

7. Plaintiffs do not allege that their property is contained in either National Recreation Area, stating only that their property is within North Cascades National Park. *See* Compl. 1. The statutory provisions creating Ross Lake and Lake Chelan National Recreation Areas use identical language, stating that those areas are "estab-

lished, *subject to valid existing rights.*" 16 U.S.C. §§ 90a, 90a–1 (emphasis added).

8. The $3,500,000 limit set in 1968 was increased to $4,500,000 in 1976 by Pub.L. 94–578. *See* 16 U.S.C. § 90d–5.

and any interest therein, within the areas described [as Point Reyes National Seashore].”); 16 U.S.C. § 79c(b)(1), (2) (“Effective on Oct. 2, 1968, there is hereby vested in the United States all right, title, and interest in, and the right to immediate possession of, all real property within the park boundaries designated [as Redwood National Park]. . . . The United States will pay just compensation to the owner of any real property taken. . . .”).

Instead, the Secretary of the Interior was given discretion in acquiring lands located within North Cascades National Park boundaries through a variety of measures and in determining the priority of such acquisitions. *See* 16 U.S.C. § 90b. “Congress intended the normal situation to be that [the NPS] would year by year use appropriated funds to purchase or condemn lands within the [park] . . . or else exchange [g]overnment land outside the area for desired land inside. . . . Landowners normally would have to wait for the [g]overnment to get around to them.” *Hilkovsky v. United States*, 205 Ct.Cl. 460, 504 F.2d 1112, 1113 (1974).

Because plaintiffs’ property is completely surrounded by North Cascades National Park, plaintiffs’ use of their property is governed, in part, by federal regulations. As the NPS explained to the Websters, federal regulations, including Title 36, Code of Federal Regulations, Part 9, Minerals Management, apply to the TCM property: “These regulations control all activities within units of the National Park [S]ystem resulting from the exercise of valid existing mineral rights on patented or unpatented mining claims without regard to the means or route by which the operator gains access to the claim.” Pls.’ App. 6A (letter from NPS Superintendent John R. Earnst to William C. Webster dated October 23, 1991) (quoting 36 C.F.R. § 9.1). “The purpose of these regulations is to insure that such activities are conducted in a manner consistent with the purposes for which the National Park System and each unit thereof were created, to prevent or minimize damage to the environment or other resource values, and to insure that the pristine beauty of the units is preserved for the benefit of present and future generations.” 36 C.F.R. § 9.1 (2009). Plaintiffs were not barred from mining the TCM property, but were required to submit plans for such operations to the NPS for evaluation and approval. In a letter to the Websters, NPS Superintendent Paleck explained that:

> If [the Websters] wish to pursue mining activities on the private land within North Cascades National Park, [the NPS] will review, under existing guidelines, any proposed plan of operations [the Websters] submit.
>
> . . . .
>
> In order to consider [the Websters’] request for access and to determine whether [the Websters’] operation complies with the mandates of all relevant legislation, [the NPS] need[s] a clear understanding of the proposed mining operation. Specific details are necessary to allow evaluation of potential resource impacts and to determine required compliance actions.
>
> . . . .
>
> After the NPS determines the proposed plan of operations contains all necessary information, the NPS will initiate a complete environmental analysis of the proposed activities. Following the environmental analysis, the plan of operations may be approved, provided it meets the standards prescribed in the regulations and all other legal requirements.

Pls.’ App 6B (letter from NPS Superintendent Paleck to William C. Webster dated September 29, 1993).

It appears that the Websters submitted a proposed “Plan of Operations for Shipment of Ore from Existing Open Cuts in the Thunder Creek Mines within North Cascades National Park” and that the NPS completed an “Environment Assessment,” dated April 17, 2000, for the proposed plan. Pls.’ App. 9. According to plaintiffs, the plan was approved in July 2000 but ore was never shipped. Compl. 4 ¶ 18. According to the government, “official records reflect that the Websters have submitted two plans of operations to NPS since 1983, the most recent in 1999–2000. The plans of operations have been for sampling, not for actual mining. The plans of operations were approved by NPS (with conditions), and were not denied.”

Decl. of Rick Wagner ¶ 6 (attached to Def.'s Mot.). Plaintiffs have not demonstrated that mining is in fact "not allowable" on the TCM property after the park's creation, only that the NPS must approve proposed plans of operations, and that to date NPS has approved the two plans plaintiffs have submitted.

In addition to the alleged interference with the mining use of the TCM property, plaintiffs allege that "the denial of modern (motorized) access and unrestricted flights" constitute a regulatory taking. Compl. 6. It is unclear how the plaintiffs would have had legal, motorized access to their property, other than by helicopter, even absent park regulations. See Decl. of Rick Wagner ¶ 4 (attached to Def.'s Mot.) (noting that "[t]he Webster inholding is approximately [nineteen] miles by foot or pack animal on park trails from the nearest highway"). According to plaintiffs' Complaint and Appendix, the NPS has suggested helicopter flight restrictions related to two proposed activities: ore shipment operations and recreational heli-hiking. See Compl. 3 ¶ 11; Pls.' App. 9. In its "Environment Assessment" for the proposed ore shipment plan, the NPS considered an alternative plan with additional conditions—namely, helicopter operation occurring after Labor Day, limited to Tuesday through Thursday, and at a minimum flight elevation of at least five hundred feet above ground level except during loading and unloading—and noted that "[i]mposition of these conditions would significantly reduce potential adverse impact on wildlife and [park] visitors." Pls.' App. 9. It is unclear whether the plan as approved included these conditions. See Compl. 4 ¶ 18; Decl. of Rick Wagner ¶ 6 (attached to Def.'s Mot.). Regarding a possible recreational heli-hiking operation, plaintiffs claim that "the NPS objected to 'noise pollution' from helicopters and said there could not be flights on weekends or holidays" and that this restriction "made a vacation-based enterprise impracticable." Compl. 3 ¶ 11.

Congress has authorized the NPS to impose restrictions on activities within park boundaries to insure that such activities are conducted in a manner consistent with the park's purposes and to prevent or minimize damage to the environment or other resource values within the park. See 16 U.S.C. § 3 (2006) (authorizing the Secretary of the Interior to "make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks"). Although certain NPS regulations do not apply on non-federally owned lands located within national park boundaries, the regulations do apply to "all persons entering, using, visiting, or otherwise within ... [t]he boundaries of federally owned lands and waters administered by the [NPS]." 36 C.F.R. § 1.2(a)(1), (b). In particular, NPS regulations prohibit "[o]perating or using aircraft on lands or waters other than at locations designated pursuant to special regulations" and "[d]elivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit." 36 C.F.R. § 2.17(a)(1), (3).

■ It is clear from plaintiffs' Complaint and, in particular, the attached correspondence from the NPS to plaintiffs that, no later than 1991, plaintiffs were aware in detail of the regulatory framework about which they complain. See Pls.' App. 6A (letter from NPS Superintendent Earnst dated October 23, 1991, explaining the applicability of federal regulations to the TCM property and enclosing "[a] copy of Part 9, Title 36, Code of Federal Regulations"). Plaintiffs' claims therefore fall outside the six-year statute of limitations.[9]

■ The gravamen of plaintiffs' allegations relate to the quarter-century negotiation process for the sale of the TCM property to the NPS. Plaintiffs' primary complaint is the length of time that plaintiffs and the government have been negotiating a prospec-

---

9. Plaintiffs' suggestion in their Response that March 10, 2003 is a significant date because geologist Luther Clemmer's 1985 report of the ore value on the TCM property then became available to them, Pls.' Resp. 5–6, is irrelevant.

Even if the NPS had concealed the Clemmer ore appraisal from plaintiffs, the ore appraisal does not relate to the regulations about which plaintiffs complain.

tive sale of plaintiffs' land within the boundaries of the park, but that delay, however unfortunate, is not enough to establish a taking. *See Hilkovsky*, 504 F.2d at 1115. The government is constrained by regulations governing its acquisition of lands, as the NPS has explained in multiple letters to plaintiffs. *See* Pls.' App. 8, 15, 16, 18. A failed negotiation between the government and a property owner does not constitute a taking. *Ferrari v. United States*, 73 Fed.Cl. 219, 225 (2006) (citing *B.W. Parkway Assocs. v. United States*, 29 Fed.Cl. 669, 680 (1993), aff'd, 36 F.3d 1116, 1994 WL 502734 (Fed. Cir.1994) (Table)). The frustration of the parties over their inability to reach an agreement as to the TCM property's value is not a matter the court is authorized to address under its takings jurisdiction. If the government's behavior in connection with the failure to conclude a negotiation is in any way actionable, the court does not perceive any jurisdictional basis to remedy that failure in this court.

## IV. Transfer

In accordance with statute and precedent the court will consider whether it may transfer plaintiffs' claims to another court. *See Tex. Peanut Farmers v. United States*, 409 F.3d 1370, 1374–75 (Fed.Cir.2005) (stating that the Court of Federal Claims should have considered whether transfer was appropriate once the court determined that it lacked jurisdiction). Section 1631 of title 28 of the United States Code provides, "Whenever a civil action is filed in a court as defined in section 610 of this title ... and that court finds that there is a want of jurisdiction, the court shall, *if it is in the interest of justice*, transfer such action...." 28 U.S.C. § 1631 (2006) (emphasis added). In order for a case to be transferred, the court must find that: (1) the transferring court lacks subject matter jurisdiction; (2) at the time the case was filed, the case could have been brought in the transferee court; and (3) such a transfer is in the interest of justice. *See* 28 U.S.C. § 1631; *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1374 (Fed.Cir.1983). "Whether a case should be transferred rests within the sound discretion of the transferor court."

*Faulkner v. United States*, 43 Fed.Cl. 54, 56 (1999).

Plaintiffs have claimed a governmental taking of their property, and the court has determined that even if any of the government's actions could be characterized as a taking, plaintiffs' takings claims are barred by the statute of limitations. Many of plaintiffs' allegations relate to their quarter-century negotiation process with the NPS and their dissatisfaction with NPS management of its land acquisition program. In particular, plaintiffs have charged the NPS with "wrongful acts." Compl. 1. The court does not have jurisdiction to determine whether plaintiffs' claims may be characterized as sounding in tort or arising under the Administrative Procedure Act (APA). Because this court lacks subject matter jurisdiction over plaintiffs' takings claims (because any such claim is time-barred) and over tort and APA claims (even if timely), the court finds it in the interest of justice to transfer plaintiffs' Complaint to a court where any tort or APA claim determined to exist could be heard. Given the location of the property at issue, plaintiffs' claims are hereby transferred to the United States District Court for the Western District of Washington.

## V. Conclusion

The court concludes that, because plaintiffs' takings claims are barred by the statute of limitations, the court lacks jurisdiction to hear the action. The Clerk of Court is directed to TRANSFER the Complaint to the United States District Court for the Western District of Washington. No costs.

IT IS SO ORDERED.